FILED & ENTERED

AUG 23 2021

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bakchell  DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

|  |  |
|---|---|
| In re:<br><br>NIKOLAY MACHEVSKY,<br><br>                      Debtor. | Case No. 2:14-bk-29611-RK<br><br>Chapter 7<br><br>**MEMORANDUM DECISION ON MOTION TO ALLOW SUPPLEMENTAL ADMINSTRATIVE EXPENSE CLAIM OF DATA LEVERAGE, LLC**<br><br>Hearing Dates:   January 15, 2021 and<br>                      June 4, 2021<br><br>Hearings conducted on Zoom for Government |

      This Chapter 7 bankruptcy case came on for hearing before the undersigned United States Bankruptcy Judge on January 15, 2021 and June 4. 2021 on the contested matter of the Motion to Allow Supplemental Administrative Expense Claim of Data Leverage, LLC ("Motion"), Docket No. 121, filed on November 25, 2020, which seeks an order allowing its amended claim requesting administrative expense priority in the amount of $293,694.87 for actual and necessary costs and expenses of preserving the estate under 11 U.S.C. § 503(b)(1)(A) and § 503(b)(3)(D).[1]  Steven R. Fox, of Fox

---

[1] The motion itself refers to 11 U.S.C. § 503(b)(2)(A), which is a misnomer because that section does not exist, but the court construes the motion to seek relief under 11 U.S.C. § 503(b)(1)(A) and (b)(3)(D) since

1   Law Corporation, Inc., appeared for Data Leverage, LLC, and Nancy Hoffmeier Zamora,

2   of Hoffmeier and Zamora, appeared for the Chapter 7 Trustee Wesley H. Avery, who

3   opposed the motion.  At these hearings, the court received evidence offered by the

4   parties and heard argument from them.  Having considered the evidence and argument

5   presented, the court issues this memorandum decision which constitutes its findings of

6   facts and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052

7   and 9014 and Federal Rule of Civil Procedure 52.

8                                                   **FACTS**

9           On October 16, 2014, Debtor Nikolay Machevsky commenced this bankruptcy

10  case by filing a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, 11

11  U.S.C.  Petition, Docket No. 1.  The appointed Chapter 7 trustee, Alberta Stahl, filed a

12  no distribution report in this bankruptcy case, Machevsky was granted a discharge, and

13  the case was closed on January 27, 2015.  *See* Case Docket Entries dated January 21,

14  2015; Discharge of Debtor, Docket No. 13, entered on January 26, 2015; Bankruptcy

15  Case Closed, Docket No. 14, dated January 27, 2015.

16          Shortly afterward, Machevsky commenced a civil action in the Superior Court of

17  California for the County of Los Angeles entitled *Machevsky v. Kleemoff*, Case No. BC

18  574900, alleging that certain real property consisting of two condominiums located at

19  10701 Wilshire Blvd., Units 1802 and 1803, Los Angeles, California  90024, belonged to

20  him and that his mother, Izabella Kleemoff, was holding title to this property for him in

21  trust.  Complaint filed in *Machevsky v. Kleemoff*, Case Number BC 574900, Trial Exhibit

22  H.  In this lawsuit, Machevsky alleged that his mother, Kleemoff, put the property up for

23  sale and entered into an agreement to sell the property to a party named Binafard

24  without his consent.  *Id.*  Machevsky obtained a judgment in his favor against Kleemoff

25  in the state court action on August 26, 2016, which confirmed his title to the property.

26  Judgment in *Machevsky v. Kleemoff*, Trial Exhibit L.  Meanwhile, Binafard had filed a

27

28  _____
the body of the motion discusses those provisions and the reference to 11 U.S.C. § 503(b)(2)(A) is a
typographical error.  Motion at 1, 7.

1  lawsuit against Kleemoff for specific performance and related declaratory relief because

2  she did not follow through on her agreement to sell the property to him, and Binafard

3  had also named Machevsky as a defendant in that action seeking declaratory relief that

4  he (Machevsky) had no right to possession or title in the property.  Complaint, *Binafard*

5  *v. Kleemoff*, Case No. BC 586794, Trial Exhibit M. [2]

6      According to a title document executed in 2011, Machevsky had transferred the

7  property to Kleemoff before he filed his bankruptcy case, and as he alleged in his state

8  court lawsuit, she was holding the property in trust for him.  Complaint filed in

9  *Machevsky v. Kleemoff*, Case Number BC 574900, Trial Exhibit H.  Based on this claim

10 and the judgment he later obtained against Kleemoff, Machevsky had a continuing

11 beneficial interest in the property when he filed his bankruptcy petition in 2014.

12 However, Machevsky did not disclose his transfer of the property to his mother or his

13 continued beneficial interest in the property on his bankruptcy petition and schedules.

14 Petition, Docket No. 1.

15     Data Leverage is a New Mexico limited liability company owned by David Preys

16 and Jennifer Preys, who are brother and sister.  Trial Declaration of David Preys,

17 Docket No. 157, filed on December 29, 2020; Trial Testimony of David Preys.  David

18 Preys is the managing member of this LLC.  *Id.*  Tanya Linton is their mother and acted

19 as the agent of Data Leverage, but she is not an owner/member of the LLC. [3]  *Id.;* Trial

20 Declaration of Tanya Linton, Docket No. 157.  Data Leverage was interested in

21 purchasing the property as an investment, and before investing, Linton conducted a due

22 diligence investigation on the property for Data Leverage by researching the legal files

23 for the Machevsky and Binafard lawsuits in the Los Angeles County Superior Court,

24

---

25 [2] The complaint in the Binafard state court action, Exhibit M, was not received into evidence at trial.  The
26 court takes judicial notice of the complaint and its allegations for the limited purpose of stating the factual
background for this matter pursuant to Federal Rule of Evidence 201.  The court does not believe that the
facts of the existence of the complaint and the nature of its allegations are in dispute.

27
28 [3] According to the State Bar of California website, Linton was formerly an attorney licensed in California,
who was disbarred in 2016.  The court takes judicial notice of this fact pursuant to Federal Rule of
Evidence 201, though this fact is not disputed as Linton gave testimony about this fact during cross-
examination.

1  researching real property records at the Los Angeles County Recorder's Office and

2  interviewing the Debtor.  Trial Declaration of Tanya Linton, Docket No. 157; Trial

3  Testimony of Tanya Linton.

4         On October 30, 2018, Machevsky and Data Leverage entered into a purchase

5  and sale agreement for sale of the property by Machevsky to Data Leverage (the

6  "Agreement") whereby Data Leverage agreed to pay unpaid mortgage payments and

7  property taxes and other expenses relating to the property and help Machevsky avoid

8  foreclosure of the existing liens on the property, and Machevsky was to transfer the

9  property to Data Leverage in exchange for a life estate for him and other covenants in

10 Unit 1802.  Purchase and Sale Agreement, Trial Exhibit A; Trial Declaration of Tanya

11 Linton, Docket No. 157; Trial Testimony of Tanya Linton; Trial Testimony of David

12 Preys.  Under the agreement, Data Leverage would be allowed to restore the partition

13 between Units 1802 and 1803 for its own use.  *Id.*

14        Machevsky was facing imminent foreclosure by the senior lender, Selene

15 Financial, on the property as a foreclosure sale on Unit 1802 had been scheduled for

16 November 2, 2018.  Notice of Default, Trial Exhibit B; Notice of Trustee's Sale, Trial

17 Exhibit C.  Data Leverage had tendered the sum of $122,572.68 to the foreclosure

18 trustee representing the arrears on the senior lien held by Selene before the scheduled

19 foreclosure sale, which was made through a wire transfer by an affiliated entity,

20 Prenton, Inc., on Data Leverage's behalf, and the foreclosure sale was cancelled.

21 Notice of Rescission of Notice of Default, Trial Exhibit E; Bank Statement showing wire

22 transfer, Trial Exhibit J; Trial Declaration of Jennifer Preys, Docket No. 157; Trial

23 Testimony of Jennifer Preys; Trial Testimony of David Preys; Trial Declaration of Tanya

24 Linton, Docket No. 157.

25        According to Data Leverage, pursuant to the agreement, on December 18, 2018,

26 it provided $30,000 in cash to Kleemoff in order for her to pay off the second lien held

27 by JP Morgan Chase on Unit No. 1802.  Trial Declaration of Tanya Linton. Docket No.

28 157.  On December 31, 2018, JP Morgan Chase Bank recorded a deed of

reconveyance based on a payoff of its second lien.  Deed of Reconveyance, Trial

Exhibit F.  Records obtained by Data Leverage from JP Morgan Chase indicate that the

amount paid the bank to record its deed of reconveyance was only $5,678.41.

Documents Produced by JP Morgan Chase in Response to Subpoena, Trial Exhibit R.

According to Data Leverage, pursuant to the agreement, it made seven monthly

mortgage payments on the senior lien held by Selene Finance from January to July

2019 totaling $17,255.50.  Trial Declaration of Tanya Linton, Docket No. 157; Trial

Declaration of David Preys, Docket No. 157; Six Payment Checks to Selene Finance,

Trial Exhibit K; Documents Produced by Selene Finance LP in Response to Subpoena,

Trial Exhibit S; *see also,* Data Leverage's Brief Following Evidentiary Hearing ("Data

Leverage's Post-Trial Brief"), Docket No. 185, filed on June 23, 2021, at 4.

According to Data Leverage, pursuant to the agreement, it paid to the Los

Angeles County Tax Collector delinquent property taxes on Unit No. 1803 in the amount

of $20,774.19, on June 27, 2019.  Trial Declaration of Tanya Linton; Trial Declaration of

David Preys; Notice of Unpaid Taxes from County of Los Angeles, Trial Exhibit G;

Check Payable to Los Angeles County Tax Collector for $20,774.19, Trial Exhibit I;

Certified Documents Produced by Los Angeles County Tax Collector in Response to

Subpoena, Trial Exhibit T; *see also,* Data Leverage's Post-Trial Brief, Docket No. 185,

filed on June 23, 2021, at 4-5.

According to Data Leverage, pursuant to the agreement, it advanced payment of

Machevsky's legal fees and costs in defending the specific performance lawsuit in

*Binafard v. Kleemoff and Machevsky*, Case No. BC 586794 (Superior Court of

California, County of Los Angeles) in the amount of $96,874.00, which were incurred

between November 1, 2018 and July 31, 2019.  Trial Declaration of Tanya Linton,

Docket No. 157.  The legal services for which these fees were incurred were performed

by Attorney Julia Sklar.  *Id.*

According to Data Leverage, it had not known of Machevsky's bankruptcy case

when it entered into the purchase and sale agreement with Machevsky in October 2018

1   based on testimony of its members and its agent, Linton, which the court finds credible.

2   Trial Testimony of David Preys; Trial Testimony of Tanya Linton; Trial Declaration of

3   Tanya Linton, Docket No. 157.  Data Leverage first learned about Machevsky's

4   bankruptcy case at the end of May 2019 or the first week of June 2019 when Linton

5   read the transcript of Machevsky's deposition in the Binafard litigation.  *Id.;* Motion at 5

6   ("In May, 2019, Data Leverage learned the Debtor's had not disclosed his interest in the

7   Real Property in this case.").

8           On July 23, 2019, the United States Trustee filed a motion with the court to

9   reopen the case to administer an undisclosed asset, which was granted, and upon

10  reopening of the case, the United States Trustee appointed Wesley Avery as the new

11  Chapter 7 trustee in this case.  Motion to Reopen Case, Docket No. 16, filed on July 23,

12  2019; Order Granting Motion to Reopen Case, Docket No. 17, filed and entered on July

13  26, 2019; Notice of Appointment and Acceptance of Trustee, Docket No. 19, filed on

14  July 31, 2019.  Trustee Avery retained Nancy Zamora, of the law firm of Zamora &

15  Hoffmeier, as his counsel in this case, and the court approved the employment of Ms.

16  Zamora and her firm.  Declaration of Wesley H. Avery, Trustee's Opposition to Data

17  Leverage's Motion under F.R.C.P. Rule 60(b)(1), (3) and (6) to Set Aside One Portion of

18  Enter Order (1) Approving Compromise; (2) Authorizing Trustee to Transfer Real

19  Property Free and Clear of Liens; (3) Requiring Debtor to Turn Over Real Property of

20  the Estate; and (4) Authorizing Trustee to Utilize U.S. Marshal and Other Law

21  Enforcement; Declarations in Support, Docket No. 82, filed on October 26, 2020, at 13.

22          The bankruptcy case was reopened based on information provided by Data

23  Leverage.  *Id.*  Linton provided information that she had just learned about the debtor's

24  failure to list the real property as assets in this bankruptcy case to Zamora in an email

25  sent on July 2, 2019, and Zamora communicated this information to Avery, who

26  conducted his own investigation and presented his findings to the United States

27  Trustee, who based on the Linton's information and Avery's findings, then filed the

28  motion to reopen the case.  *Id.,* Declaration of Nancy Hoffmeier Zamora, Trustee's

Opposition to Data Leverage's Motion under F.R.C.P. Rule 60(b)(1), (3) and (6) to Set Aside One Portion of Enter Order (1) Approving Compromise; (2) Authorizing Trustee to Transfer Real Property Free and Clear of Liens; (3) Requiring Debtor to Turn Over Real Property of the Estate; and (4) Authorizing Trustee to Utilize U.S. Marshal and Other Law Enforcement; Declarations in Support, Docket No. 82, filed on October 26, 2020, at 16-18.  Trustee Avery retained Zamora as his counsel due to her familiarity with the underlying facts about the case.  *Id.* [4]

---

[4]  In the Motion, Data Leverage asserts that the trustee retained Zamora as his counsel, "despite Ms. Zamora being Data Leverage's counsel and having learned confidential information from Tanya Linton and Data Leverage."  Motion at 5 and n. 1.  Data Leverage further asserted: "Under Rule 83-3.1.2 of the Local Rules of the Central District of California, California's standards of professional conduct by attorneys are applicable in Central District Courts, including bankruptcy courts.  California Rule of Professional Responsibility 3-310(E) governs successive representation of clients with adverse interests and requires written consent.  Zamora does not have written consent from Data Leverage to represent the Chapter 7 Trustee in this case."  *Id.* at 5-6 n. 1.  In response, the trustee stated in his opposition to the Motion: "Barely worth mentioning is a repeat of Movant's false and misleading assertion regarding counsel's employment by Trustee.  This is a 'red herring.'  There is no motion.  There is no evidence.  It is an empty accusation made to distract from the fact that Movant couldn't even look up Debtor's bankruptcy filing on a computer."  Opposition to Motion to Allow Supplemental Administrative Expense Claim of Data Leverage, LLC ("Opposition"), Docket No. 130, filed on December 4, 2020, at 12.

Local Bankruptcy Rule 2090-2 addresses the standards of professional conduct for attorneys appearing in this court, stating: "An attorney who appears for any purpose in this court is subject to the standards of professional conduct set forth in Local Civil Rule 83-3 [of the United States District Court for the Central District of California]."  Local Civil Rule 83-3.1.2 states: "In order to maintain the effective administration of justice and the integrity of the Court, each attorney shall be familiar with and comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto. These statutes, rules and decisions are hereby adopted as the standards of professional conduct, and any breach or violation thereof may be the basis for the imposition of discipline."

The circumstances of the initial contact and communication between Linton on behalf of Data Leverage and trustee's counsel in July 2019 from the first contact in email exchange between them on July 2, 2019 and counsel's return of Data Leverage's retainer check on July 17, 2019 are described in Linton's declaration in support of Data Leverage's motion for reconsideration of the compromise/sale order, Declaration of Tanya Linton, to Data Leverage's Motion under F.R.C.P. Rule 60(b)(1), (3) and (6) to Set Aside One Portion of Enter Order (1) Approving Compromise; (2) Authorizing Trustee to Transfer Real Property Free and Clear of Liens; (3) Requiring Debtor to Turn Over Real Property of the Estate; and (4) Authorizing Trustee to Utilize U.S. Marshal and Other Law Enforcement; Declarations in Support, Docket No. 73, filed on October 18, 2020, at 21-22 and counsel's declaration in opposition to Data Leverage's reconsideration motion, Declaration of Nancy Hoffmeier Zamora, Trustee's Opposition to Data Leverage's Motion under F.R.C.P. Rule 60(b)(1), (3) and (6) to Set Aside One Portion of Enter Order (1) Approving Compromise; (2) Authorizing Trustee to Transfer Real Property Free and Clear of Liens; (3) Requiring Debtor to Turn Over Real Property of the Estate; and (4) Authorizing Trustee to Utilize U.S. Marshal and Other Law Enforcement; Declarations in Support, Docket No. 82, filed on October 26, 2020, at 16-18.

1

2

The initial contact between Data Leverage and trustee's counsel was Linton's email to counsel of July 2, 2019 at 1:34 p.m. with the subject heading, "Consult details and Fed Ex tracker," stating:

3

4

5

6

7

8

9

> Nancy: here is the scoop.  My team Data Leverage LLC, a New Mexico LLC registered to do business in CA. Wishes to acquire the assets of Nikolay Machevsky.  He controls two condo units on Wilshire corridor, 10701 Wilshire units 1802 and 1803.  The wrinkle: Machevsky deeded the units to his parents living trust, with agreement to hold it in trust for him.  He then filed Ch. 7 in late 2014.  Case no. 2:14-bk-29611-RK.  Does not list the real estate as assets.  He promptly gets a discharge in January 2015.  He then gets wind that Mommy is trying to sell the units from under him and pocket the money.  He sues her in state superior court, beginning in March 2015, some 45 days post discharge, gets a judgement which is now final, more than 2 years.  Data Leverage wants to acquire the units, part of the deal is a life estate for him in unit 1802.  Clearly this has implications as far as BK court.  Please take an initial look.  Give me a time after the holiday that is good for you to talk.  Retainer for initial look is out Fed Ex tracker: [number omitted],  Have a great holiday.  Look forward to looking with you on this matter.  Tanya.

10

11

12

13

Email exchange between Linton and trustee's counsel, Exhibit D to Docket No. 82 at 35.  According to Linton, "When we learned of the closed bankruptcy case, we knew enough to know that there was a problem.  On Data Leverage's behalf, I consulted with Nancy Zamora, an attorney I have known over the years and from whom I have previously sought legal advice for persons or companies connected with Data Leverage."  I hired her for a consultation and for legal services so that Data Leverage would know what to do.  Following the consultation, I sent her a retainer check from Data Leverage."  Linton Declaration, Docket No. 73 at 21-22.

14

Trustee's counsel's response to Linton's initial email of July 9, 2019 at 1:34 p.m. was an email of July 9, 2019 at 1:48 p.m., 14 minutes afterwards, stating:

15

16

17

18

> Tanya:  I just checked the docket for the chapter 7 case.  I know Debtor's counsel and he is easy to work with and I expect did not have a clue about the Debtor's pre-petition planning and transfer of the real property.  Do we have copies of the historic transfer documents, the liens that existed at the time of transfer to the living trust, state court litigation pleadings, judgment, etc.  The prior chapter 7 trustee is dead so I am not sure who the U.S. Trustee would appoint as chapter 7 trustee when this case is reopened, which would need to occur under the circumstances as I currently understand them.  Nancy.

19

20

Email exchange between Linton and trustee's counsel, Exhibit D to Docket No. 82 at 35.  Seventeen minutes later, Linton responded in an email at 2:05 p.m., stating:

21

22

> I don't know the Debtor Counsel.  I will get you the state court judgment, and the history of transfers.  Is there any reason you could not be trustee if this were assigned to you?  I mean you don't have any information, that is not part of the public record.  Will talk after the holiday.  Tanya.

23

*Id.*  Trustee's counsel described the circumstances of the contact with Linton:

24

25

26

27

28

> In July 2019, Tanya Linton contacted me.  I knew Ms. Linton from other unrelated bankruptcy cases in which I served as the chapter 7 trustee.  Ms. Linton communicated public information that, if verified, could be the basis for the reopening of the case.  I reviewed the docket for the Case on Pacer.  I discovered that the Case had been administered in the Los Angeles Division.  Alberta Stahl had been the initial trustee.  I am a chapter 7 trustee in the San Fernando Valley Division.  I contacted the Trustee, a chapter 7 trustee in the Los Angeles Division, and communicated the information given to me by Ms. Linton.  Trustee investigated the public information, real property records, and the state court cases and presented his findings to the UST.  Based on the information Ms. Linton supplied and the research, investigation, and analysis Trustee conducted, the UST filed a motion to reopen the Case.  Based on my familiarity with the underlying facts about the Case, Trustee engaged me as Trustee's general counsel in the Case.

1

_____

2    Zamora Declaration, Docket No. 82 at 16-17.  According to trustee's counsel, "The aforementioned facts
3    describe a common scenario in trustee practice.  That is, third party information presented as true and
     accurate results in administrative action after research and investigation.  This happens all the time.
4    What distinguishes this third party presentation from others is that it runs alongside a request for my
     appointment as trustee, plus the promise of engagement as a legal counsel.  None of this makes sense."
5    *Id.* at 17.

6    The rule of professional conduct applicable to the circumstances described in these declarations appears
     to be Rule 1.18, Duties to Prospective Client, newly adopted in the California Rules of Professional
7    Conduct ("CRPC"), effective November 1, 2018.  *See Skybell Technologies, Inc. v. Ring, Inc.,* No. SACV
     19-00014 JVS (JDEx), 2018 WL 6016156 at *4 (C.D. Cal. Sept. 18, 2018) ("The new version of the
8    California Rules of Professional Conduct differs from the old version of the Rules in several major
     respects.  Relevant to the present motion, the new version contains a rule with no corresponding prior
9    counterpart, Rule 1.18, regarding duties to prospective clients.  The old version of the Rules is silent with
     regards to duties to prospective clients, and instead contains Rule 3-310, which concerns avoiding
10   representation of adverse interests to both current and former clients.") (footnote omitted).  As indicated
     by Linton's first email to counsel on July 2, 2019, she on behalf of Data Leverage was consulting with
11   counsel for the purpose of retaining her services as Data Leverage's counsel with explicit references to
     "Consult details" and submitting a retainer.  CRPC Rule 1.18(a) states: "A person who, directly or through
12   an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal
     service or advice from the lawyer in the lawyer's professional capacity, is a prospective client."  In so
13   contacting counsel, Linton and Data Leverage appear to be a prospective client within the meaning of
     Rule 1.18.

14
     CRPC Rule 1.18(b) sets forth a duty of an attorney not to use or disclose confidential information
15   provided by a prospective client, stating: "Even when no lawyer-client relationship ensues, a lawyer who
     has communicated with a prospective client shall not use or reveal information protected by Business and
16   Professions Code section 6068, subdivision (e) and rule 1.6 that the lawyer learned as a result of the
     consultation, except as rule 1.9 would permit with respect to information of a former client."  Counsel
17   disputes that any lawyer-client relationship with Data Leverage ensued as she returned Data Leverage's
     retainer check to Linton on July 17, 2019, stating that "[t]here was no legal advice offered" and that
18   "[t]here was no agreement regarding my engagement."  Zamora Declaration, Docket No. 82 at 17.  There
     does not appear to have been an express agreement for an attorney-client relationship between Data
19   Leverage and trustee's counsel, particularly when counsel returned the retainer check on July 17, 2019,
     but whether such a relationship before then can be implied is unclear.  *See* Tuft, Peck and Mohr, *Rutter*
20   *Group California Practice Guide: Professional Responsibility,* ¶ 3:47 (online edition, December 2020
     update) (stating "an attorney-client relationship may be implied where the prospective client 'has
21   manifested the intent to seek legal advice and has a reasonable expectation that he or she is consulting a
     lawyer in a professional capacity."), *citing and quoting, Westinghouse Electric Corp. v. Kerr-McGee Corp.,*
22   580 F.2d 1311, 1319 (7th Cir. 1978) and *Restatement (Third), Law Governing Lawyers,* § 14, Comment
     "c".  Linton's initial email to trustee's counsel indicated that the purpose of the email as stated in the
23   subject heading was "Consult details," asking counsel to "take an initial look," and sending by FedEx a
     retainer for the "initial look."  Counsel in her response to this email did not tell Linton that she was not
24   agreeing to the consultation or an attorney-client relationship, but asked Linton for more information about
     the case.  These circumstances indicate that Data Leverage was a prospective client for purposes of the
25   CRPC, which provides other rules regarding receipt of confidential information from a prospective client
     which Data Leverage asserts that it gave counsel.
26
     CRPC Rule 1.18(c) further provides that an attorney may not represent a client whose interests are
27   adverse to the prospective client in the same or substantially related matter if the confidential information
     provided by the prospective client is material to the matter:
28
          A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to
          those of a prospective client in the same or a substantially related matter if the lawyer received

1    On November 5, 2019, Data Leverage filed a proof of claim in this case in the

2  amount of $293,694.87, seeking payment of the expenses that it had incurred pursuant

3  to the agreement that it had with the debtor.  Proof of Claim, Trial Exhibit D.  The proof

4  of claim was filed on its behalf by its then attorney, Michael Sment, whose address was

5  listed as Data Leverage's address for notice purposes.  *Id.*

6    In light of the competing claims to the property on behalf of Binafard, the

7  prospective purchaser, and on behalf of Kleemoff, who had also filed for bankruptcy,

8  Avery, the Chapter 7 trustee in this case, negotiated a proposed settlement with these

9  parties and filed motions for approval of compromise with these parties pursuant to

10  Federal Rule of Bankruptcy Procedure 9019, which provided for sale of the property to

---

from the prospective client information protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6 that is material to the matter, except as provided in paragraph (d). If a lawyer is prohibited from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d).

CRPC Rule 1.18(d)(1) does provide for an exception to the restriction of Rule 1.18(c) if the prospective client provides written consent: "When the lawyer has received information that prohibits representation as provided in paragraph (c), representation of the affected client is permissible if: (1) both the affected client and the prospective client have given informed written consent, . . . ."  Data Leverage asserted in the Motion that Trustee retained counsel despite her "being Data Leverage's counsel and having learned confidential information from Tanya Linton and Data Leverage" and that she "does not have written consent from Data Leverage to represent the Chapter 7 Trustee in this case."  Motion at 5 and n. 1.  The validity of these assertions of Data Leverage appear to turn on whether the information provided by Linton to counsel was confidential for purposes of CRPC Rule 1.8 and its subparts, or specifically, to use the words of the rule, "information protected by Business and Professions Code section 6068, subdivision (e) and rule 1.6."  *See Ocean Thermal Energy Corp. v. Coe,* No. LACV 19-05299-VAP-JPR, 2020 WL 5237276 at *6-9 (C.D. Cal. Jul. 29, 2020); *see also, People ex rel. Department of Corporations v. SpeeDee Oil Change Systems, Inc.,* 20 Cal.4th 1135, 1148-1152 (1999).  The information protected under California Business and Professions Code § 6068(e) and CRPC Rule 1.6 is not specifically defined by the statute and is generally understood to refer to client secrets.  *See* Tuft, Peck and Mohr, *Rutter Group California Practice Guide: Professional Responsibility,* ¶¶ 7:25 and 7:38, *citing inter alia,* California Business and Professions Code § 6068(e). The information apparently asserted by Data Leverage to be confidential is the fact that the debtor did not list his real property assets on his bankruptcy petition and schedules does not seem to fit neatly into a category of information generally understood to be a client secret, such as the client's identity, the client's whereabouts, the client's written fee agreement with the attorney, the client's criminal or unlawful behavior, the unlawful activity by a constituent of an organization client, the client's erratic behavior, financial information about the client, settlements of the client, embarrassing personal information relating to a client or representation of a minor client, because the information does not pertain to the prospective client, but to a third party, the debtor, though the information may have been "confidential" in a loose sense as it was not generally known, at least, by the United States Trustee.  *Id.,* ¶¶ 7:50 through 7:76.2.  The court has examined Data Leverage's assertions to determine whether it has an impact on a determination of the Motion.  The court concludes that it is not necessary to determine the validity of Data Leverage's assertions to determine the Motion as to whether Data Leverage is entitled to an administrative expense claim for its expenditures.

1    Binafard in settlement of his specific performance claim and allowance of a claim for the

2    Kleemoff bankruptcy estate.  Motions to Approve Compromise, Docket Nos. 45 and 48,

3    filed on August 11, 2020.  The compromise/sale motions were granted without

4    objection, and orders granting the motions were entered on September 16, 2020.

5    Orders Approving Compromises, Docket Nos. 53 and 54, filed and entered on

6    September 16, 2020.

7         On September 29, 2020, the debtor, Machevsky, filed a motion for

8    reconsideration of the order granting the compromise/sale motion, which the trustee

9    opposed.  Debtor's Motion for Reconsideration, Docket No. 61, filed on September 29,

10   2020.  By order entered on October 9, 2020, the court denied the debtor's motion for

11   reconsideration.  Order Denying Debtor's Motion for Reconsideration, Docket No. 71,

12   filed and entered on October 9, 2020.

13        On October 18, 2020, Data Leverage filed its motion for reconsideration of the

14   order granting the compromise/sale motion, contending that having filed a proof of

15   claim, which was deemed allowed in absence of an objection, it was a creditor entitled

16   to notice of the motion, which it contended that it had not received, and that it was

17   entitled to overbid on the proposed sale to Binafard.  Data Leverage's Motion for

18   Reconsideration, Docket No. 73, filed on October 18, 2020.  After an evidentiary

19   hearing, the court granted Data Leverage's reconsideration motion in part to allow it to

20   be heard on the merits of the motion to approve compromise/sale, but the court denied

21   the reconsideration motion on the merits on grounds that the compromise/sale was

22   within the reasonable business judgment of the trustee and that the compromise/sale

23   was fair and equitable.  Statement of Decision and Order Denying Data Leverage's

24   Motion for Reconsideration, Docket Nos. 151 and 152, filed and entered on December

25   16, 2020.

26        On November 2, 2020, the trustee filed an objection to Data Leverage's claim,

27   which contended among other things that the claim was not a proper prepetition claim

28   as the amounts of the claim were incurred by Data Leverage postpetition, which the

court sustained by order filed and entered on December 10, 2021.   Objection to Claim No. 1 filed by Data Leverage, LLC, Docket No. 97, filed on November 2, 2020; Order Sustaining Objection to Claim No. 1 filed by Data Leverage, LLC, Docket No. 144, filed and entered on December 10, 2020.

On November 25, 2020, Data Leverage filed the Motion, which is essentially an amended motion to allow its claim, but as a postpetition administrative expense claim. Motion at 1.  The itemized expenses claimed by Data Leverage as administrative expenses of the estate totaling $293,694.87 are as follows:

1. Due Diligence/Legal Fees & Expenses (for agreement with Debtor) in the amount of $6,500.00, incurred on October 15, 2018.

2. Reinstatement of First Trust Deed Loan (Selene Finance, Loan No. 783605 for Unit No. 1802) in the amount of $122,572.68, incurred on November 1, 2018.

3. Payoff/Removal of Second Trust Deed Loan (JP Morgan Chase for Unit No. 1802) in the amount of $30,000.00, incurred on December 15, 2018

4. Payment to First Trust Deed Loan (Selene Finance) in the amount of $2,435.32, incurred on January 1, 2019.

5. Payment to First Trust Deed Loan (Selene Finance) in the amount of $2,435.32, incurred on February 1, 2019.

6. Payment to First Trust Deed Loan (Selene Finance) in the amount of $2,435.32, incurred on March 1, 2019.

7. Payment to First Trust Deed Loan (Selene Finance) in the amount of $2,435.32, incurred on April 1, 2019.

8. Payment to First Trust Deed Loan (Selene Finance) in the amount of $2,435.32, incurred on May 1, 2019.

9. Payment to First Trust Deed Loan (Selene Finance) in the amount of $2,435.32, incurred on June 1, 2019.

10. Payment to First Trust Deed Loan (Selene Finance) in the amount of

$2,362.08, incurred on July 1, 2019.

11. Payment to Los Angeles County Tax Collector (Delinquent Property Taxes for

Unit No. 1803) in the amount of $96,874.002, incurred on June 27, 2019.

12. Advance of Legal Fees & Costs to Debtor for State Court Litigation – *Binafard*

*v. Kleemoff, Machevsky*, LASC Case No. BC 586794 in the amount of

$96,874.00, incurred between November 1, 2018 and July 31, 2019.

*Id.* at 6; Request for Judicial Notice, Exhibit D, Docket No. 122, filed on November 25, 2020.

On December 4, 2020, the Chapter 7 Trustee filed an opposition to Data Leverage's motion for allowance of its administrative expense claim.  Opposition to Motion to Allow Supplemental Administrative Expense Claim of Data Leverage, LLC ("Opposition"), Docket No. 130, filed on December 4, 2020.

On January 15, 2021 and June 4, 2021, the court conducted evidentiary hearings on this contested matter of Data Leverage's motion for allowance of its administrative expense claim.

The court continued the initial evidentiary hearing on January 15, 2021 in order for Data Leverage to obtain records to obtain better documentary substantiation of its claims that it made payments that actually benefitted the estate by paying down the mortgage and property tax obligations on the property.  Specifically, Data Leverage made efforts to obtain records from lienholders for the loan and tax accounts on the property, including Selene Finance, JP Morgan Chase Bank and Los Angeles County Tax Collector, and was able to obtain some of these records.  Trial Exhibits R, S and T.

Subsequently, Data Leverage modified its claims based on obtaining these records and on further consideration.  As explained in its post-trial briefing, Data Leverage stated:

When the evidentiary hearing began, Data announced that it would not go forward on a claim for reimbursement of the $6,500 due diligence fee. Data also announced that it would not go forward with its claim for reimbursement for legal fees of $96,874 that Data had advanced to fund the defense of litigation by Bin[a]fard and the HOA both seeking to take the units from the Debtor. With

-13-

respect to the $30,000 Data provided to Izabella Kleemoff to pay off the 2nd position deed of trust on unit 1802 to JP Morgan Chase ("Chase"), Data announced that it was not going forward on this claim either. The facts are undisputed here. Ms. Linton testified that Data had provided the $30,000 to Ms. Kleemoff to pay off the Chase note but Data, after receiving documents pursuant to subpoena from Chase, had learned that while Data had paid $30,000 to Ms. Kleemoff, Ms. Kleemoff, in turn, had cut a deal with Chase to pay off the 2nd not for the $30,000 but for $5,678.41. The Court had granted Data time to subpoena various lenders for documents. The results of the subpoenas revealed that Data should not go forward on its request for reimbursement for the Chase payoff.

In all, Data announced that it was not going forward with its claims for substantial contribution for $133,374 for the due diligence fee, the payment of legal fees and the payoff of the Chase second. Data's initial request was for $293,694.87.

Data Leverage's Post-Trial Brief, Docket No. 185, at 5-6.

As to the remaining expenditures, Data Leverage argues:

There is no doubt that Data's disbursements benefitted the estate.

- Unit 1802, the Selene Finance First Deed of Trust. Unit 1802 was going to foreclosure sale in November, 2018. (Exhibit "B", Notice of Default; Exhibit "C", Notice of Sale; Declaration of Tanya Linton, page 1, paragraphs 4 and 5.) The undisputed evidence, both oral testimony and written documentation, shows that Data paid $122,572.68 to Selene. (Declaration of Tanya Linton, page 3, paragraph 17; Exhibit "E"; Declaration of Jennifer Preys, page 1, paragraphs 2 and 3; Exhibit "J"; Exhibit "M", Bates Stamp Nos. 30, 45; Supplemental Declaration of Tanya Linton, pages 1 and 2, paragraph 4; Exhibit "M", Bates Stamp No 48 and 30.) By paying this sum, Data stopped the foreclosure and the estate, when later reopened, sold the unit with a considerable profit. Had Data not put up the monies to stop the foreclosure, unit 1802 would have been lost to foreclosure. <u>Dollar benefit to estate: $122,572.68.</u>

- Unit 1802, the monthly payments to Selene. Data paid seven monthly mortgage payments for Selene (and secured by Unit 1802) through the July, 2019, payment. (Declaration of Tanya Linton, page 4, paragraph 20; Declaration of David Preys, page 1, paragraphs 3 and 4; Exhibit "K"; Exhibit M, Bates Stamped Nos. 32 through 36, and No. 26, item 157.) That benefitted the estate by a reduction of indebtedness of $17,255.50 and it prevented Selene from starting a new foreclosure. <u>Dollar benefit to estate: $17,255.50.</u>

- Real Property Taxes. Data paid a portion of the defaulted real property

taxes for Unit 1803 in the amount of $20,774.19. At the time that Data made the payment for these taxes, Data knew about the closed bankruptcy case but did not then know the impact of the prior case and what it meant legally. The undisputed testimony at the hearing by Ms. Linton was that Data had a contractual obligation to pay the taxes (Declaration of Tanya Linton, page 5, paragraph 21; Exhibit "G"; Exhibit "I"; Declaration of David Preys, page 1, paragraph 5; Exhibit "I"), the taxes had to be paid within a couple of days, by or about June 27, 2019, or else the unit would be set for sale. While the sale date would be some date in the future, by setting the unit for sale, the only way to cure the default was to pay in full. By paying the $20,774.19, Data could delay the setting of the tax sale date and Data could make arrangements to pay the remaining unpaid taxes over time. <u>Dollar benefit to estate: $20,774.19.</u>

The dollar value of Data's contribution far exceeds the figures above because but for Data's contributions, the two units and their equity would have been lost and the estate would not today be in the position it finds itself.

*Id.* at 3-4.

## ANALYSIS

A. <u>Movant's contentions</u>

According to Data Leverage, its motion "is based on post-petition expenditures by Data Leverage from October 30, 2018 and into July, 2019, during a period of time after the Debtor's case had been closed and before it was reopened on July 26, 2019 (the 'Gap Period') of actual, necessary costs and expenses in preserving the estate." Motion at 1. Data Leverage requests administrative expense priority for its expenditures which it claims are actual, necessary costs and expenses of preserving the estate under 11 U.S.C. § 503(b)(1)(A) and (b)(3)(D). *Id.* at 7.

Data Leverage asserts: "Administrative expenses relevant in this matter include those which preserve property of the estate under [11 U.S.C.] § 503(b)(1)(A) or provide a substantial contribution under [11 U.S.C.] § 503(b)(3)(D)." *Id.* at 7. Data Leverage specifically contends that its expenditures should be compensable as administrative expense claims for the following reasons:

Preventing a foreclosure or tax sale of the Real Property by advancing the funds necessary to rescue the property is clearly preserving property of the estate and along with mortgage payments and the other expenditures by Data Leverage

provided a substantial contribution to the estate.  If Data Leverage had not rescued the Real Property in 2018 and 2019, there would be no property for the estate to liquidate and distribute to creditors today.

*Id*. at 7.

   B.   11 U.S.C. § 503(b)(1)(A)

   Data Leverage first relies upon 11 U.S.C. § 503(b)(1)(A) for its administrative expense claim. 11 U.S.C. § 503 provides in pertinent part:

   (a) An entity may file a timely request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.

   (b) After notice and a hearing, there shall be allowed administrative expenses. . . including—

       (1)(A) the actual, necessary costs and expenses of preserving the estate, including--- (i) wages, salaries, or commissions for services rendered after the commencement of the case. . . .

11 U.S.C. § 503(a) and (b)(1)(A); *see also*, *In re DAK Industries, Inc*., 66 F.3d 1091, 1094 (9th Cir. 1995).  As the Ninth Circuit stated in *DAK Industries*, Data Leverage has the burden of proving an administrative expense claim as the claimant.  *Id*.

   11 U.S.C. § 503(b)(1)(A) of the Bankruptcy Code sets forth a nonexhaustive list of allowable administrative expenses constituting "the actual, necessary costs and expenses of preserving the estate."  However, in order for an expense be allowable under 11 U.S.C. § 503(b)(1)(A), it must meet the two-part standard enunciated by the Ninth Circuit in *DAK Industries*: "The claimant must show that the debt asserted to be an administrative expense (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate."  *Id*. While *DAK Industries* was a Chapter 11 bankruptcy case with a debtor-in-possession exercising the powers of a trustee pursuant to 11 U.S.C. §§ 1106 and 1107, the courts have applied this test in evaluating administrative expense claims under 11 U.S.C. § 503(b)(1)(A) in Chapter 7 bankruptcy cases with a Chapter 7 trustee exercising the

1    powers of a trustee pursuant to 11 U.S.C. § 704.  *In re 800Ideas.com, Inc.,* 496 B.R.

2    165, 175 (9th Cir. BAP 2013); *In re Nichols*, BAP No. AZ-09-1326 PaDJu, 2010 WL

3    6259965 at *5-6 (9th Cir. BAP Mar. 17, 2010); *In re Forrest*, 611 B.R. 622, 667 (C.D.

4    Cal. 2019).

5         The Ninth Circuit Bankruptcy Appellate Panel in *In re Nichols* summarized the

6    standard to apply for 11 U.S.C. § 503(b)(1)(A) administrative expense claims in a

7    Chapter 7 bankruptcy case, substituting the Chapter 7 trustee for the Chapter 11

8    debtor-in-possession:

9         Section 50[3](b)(1)(A) [5] provides that, "After notice and a hearing, there shall be
10        allowed administrative expenses ... including—(1)(A) the actual, necessary costs
          and expenses of preserving the estate[.]" The bankruptcy court has "broad
11        discretion" in making or denying such awards. *Microsoft Corp. v. DAK Indus.* (*In
          re DAK Indus.*), 66 F.3d 1091, 1094 (9th Cir.1995). In the Ninth Circuit and
12        elsewhere, to secure an allowed administrative expense under § 50[3](b)(1)(A),
          the claimant must show that the claim in question "(1) arose from a transaction
13        with the [trustee] (or alternatively, that the claimant gave consideration to the
          [trustee]), and (2) directly and substantially benefitted the estate." *Abercrombie v.*
14        *Hayden Corp.* (*In re Abercrombie*), 139 F.3d 755, 756–57 (9th Cir.1998) (quoting
          *Microsoft Corp. v. DAK Indus.* (*In re DAK Indus.*), 66 F.3d 1091, 1094 (9th
15        Cir.1995); accord *In re Merry–Go–Round Enters., Inc.,* 180 F.3d 149 (4th Cir.
          1999); *In re Sunarhauserman, Inc.,* 126 F.3d 811, 816 (6th Cir.1997); *Trustees of*
16        *Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100 (2d Cir.1986). The
17        purpose of the administrative expense priority afforded by the Code is to
          encourage third parties to enter into agreements with the trustee for the benefit of
18        the estate. *Boeing v. N. Am., Inc. v. Ybarra* (*In re Ybarra*), 424 F.3d 1018, 1026
          (9th Cir.2005); *In re Kadjevich*, 220 F.3d 1016, 1019 (9th Cir.2000) (noting that
19        the policy underlying administrative priority status is to encourage parties to take
20        risks in entering agreements with trustee); *In re Abercrombie*, 139 F.3d at 757
          (citing encouragement of third parties to deal with the trustee).
21

22        In determining whether there was a transaction with the trustee, the creditor
23        asserting an administrative expense claim must prove there was some
          inducement by the trustee causing the creditor to incur the expense. *In re United*
24        *Trucking Servs., Inc.*, 851 F.2d 159, 162 (6th Cir.1988). The alternative to
          proving a transaction, a showing that the claimant gave consideration to the
25        trustee, requires that the creditor prove that the trustee induced the creditor's
26        performance, and that performance was then rendered by the creditor to the
          estate. *In re White Motor Corp.*, 831 F.2d 106, 110 (6th Cir.1987).
27

28    ─────────────────────
      [5]  The text of the opinion refers to "Section 501(b)(1)(A)," which appears to be a typographical error since
      the quoted statutory text comes from 11 U.S.C. § 503(b)(1)(A) and there is no Section 501(b)(1)(A) in the
      Bankruptcy Code.  *See* 11 U.S.C. §§ 501(b) and 503(b)(1)(A).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Nichols*, BAP No. AZ-09-1326 PaDJu, 2010 WL 6259965 at *5-6 (footnote omitted).

Finally, 11 U.S.C. § 503(b)(1)(A) is strictly construed because as the Ninth Circuit stated in *DAK Industries*, "In order to keep administrative costs to the estate at a minimum, 'the actual, necessary costs and expenses of preserving the estate,' § 503(1)(A), are construed narrowly." *DAK Industries*, 66 F.3d at 1094. (citation omitted).

The expenditures claimed by Data Leverage as administrative expenses may not be allowed pursuant to 11 U.S.C. § 503(b)(1)(A) because such expenditures do not meet the two-part standard of *DAK Industries* that (1) the expense arose from a transaction with the debtor-in-possession or the trustee representing the bankruptcy estate as opposed to the prebankruptcy debtor; or (2) the expenses directly and substantially benefitted the estate.

The evidence before the court in this matter shows that the real property at issue was not scheduled as an asset of the Debtor on his bankruptcy petition and schedules in this Chapter 7 bankruptcy case, and thus, the property was not abandoned when the bankruptcy case was closed.  11 U.S.C. § 554(c); *see also, Cusano v. Klein,* 264 F.3d 936, 945-946 (9th Cir. 2001).  Thus, the real property remained property of the bankruptcy estate in this Chapter 7 bankruptcy case pursuant to 11 U.S.C. § 541 and subject to the supervision and control of the Chapter 7 trustee pursuant to 11 U.S.C. § 704. *Id.*

Data Leverage's expenditures relating to the real property, an asset of the Chapter 7 bankruptcy estate, were incurred in transactions with the Debtor himself in October 2018, and not with the Chapter 7 trustee who had supervisory authority and legal control of the property as an asset of the bankruptcy estate pursuant to 11 U.S.C. §§ 541 and 704.  The evidence indicates that many of Data Leverage's expenditures were made without knowledge of the Debtor's bankruptcy case as its witnesses credibly testified. The circumstances may indicate that Data Leverage was an innocent third

1   party which may have made these expenditures relating to the property without

2   knowledge that it was an asset of a bankruptcy estate under the supervision and control

3   of the Chapter 7 bankruptcy trustee.  Thus, when Data Leverage had incurred these

4   expenditures relating to the property in transacting with the Debtor after entering the

5   October 2018 agreement to buy the property, it was acting in its own and Debtor's

6   interests in acquiring the property from Debtor (i.e., Data Leverage made these

7   expenditures in accordance with its contractual obligations under the agreement), and

8   not for the benefit of the bankruptcy estate and its creditors.  Data Leverage cannot

9   argue that many of these expenditures arose from transactions with the Chapter 7

10  trustee because it did not know of the bankruptcy case or of the trustee when it made

11  these expenditures.

12       The evidence in this matter also shows that Data Leverage's investigation of the

13  property for a prospective investment and purchase did not uncover the existence of

14  Debtor's pending bankruptcy case, but Data Leverage did eventually learn of the

15  pendency of the bankruptcy case. [6]  However, despite this knowledge of Debtor's

16  bankruptcy case, Data Leverage made some of the later expenditures relating to the

17  property on its own, and still without the knowledge and consent of the Chapter 7

18  trustee.  None of Data Leverage's expenditures relating to the property arose from a

19  transaction with the Chapter 7 trustee because either Data Leverage lacked knowledge

20  of the existence of the bankruptcy trustee or it made the expenditure on its own with

21  knowledge of the trustee's existence, but without the trustee's involvement.

22       As stated by the Ninth Circuit Bankruptcy Appellate Panel in *In re Nichols*, in

23  determining whether there was a transaction with the trustee, the creditor asserting an

24  administrative expense claim under 11 U.S.C. § 503(b)(1)(A) must prove there was

25

26  [6] The parties in their post-trial brief argue over the sufficiency of Data Leverage's due diligence
    investigation before it entered the purchase and sale agreement with the Debtor.  Data
27  Leverage's Brief Following Evidentiary Hearing, Docket No. 185, filed on June 23, 2021, at 7-9;
    Trustee's Brief in Opposition to Motion to Allow Supplemental Administrative Expense Claim of
28  Data Leverage, LLC, filed on June 23, 2021, at 8-10.  The court finds that it is unnecessary to
    determine the issue of whether the due diligence was sufficient to decide the Motion.

1  some inducement by the trustee causing the creditor to incur the expense. *In re Nichols*,

2  BAP No. AZ-09-1326 PaDJu, 2010 WL 6259965 at *6, citing, *In re United Trucking*

3  *Servs., Inc.*, 851 F.2d at 162.  There is no evidence in this case showing that there was

4  some inducement by the Chapter 7 trustee causing Data Leverage to incur the

5  expenses that it now claims as administrative expenses.  The evidence in this case

6  indicates that Data Leverage made these expenditures on its own to pursue its

7  purchase of the property from the Debtor.  As further stated by the Bankruptcy Appellate

8  Panel in *In re Nichols*, the alternative to proving a transaction, a showing that the

9  claimant gave consideration to the trustee, requires that the creditor prove that the

10  trustee induced the creditor's performance, and that performance was then rendered by

11  the creditor to the estate. *Id.*, citing, *In re White Motor Corp.,* 831 F.2d at 110.  Likewise,

12  there is no evidence that the Chapter 7 trustee induced Data Leverage's performance

13  rendered by it to the estate as the evidence shows that Data Leverage rendered such

14  performance to further its own interests in purchasing the property in its transaction with

15  the Debtor as reflected in their October 2018 agreement. [7]

16  Because Data Leverage's expenditures fail the transaction prong of the two-part

17  test in *DAK Industries*, its claim under 11 U.S.C. § 503(b)(1)(A) may not be allowed.

18  Data Leverage's expenditures also fail the direct and substantial benefit prong of

19  the two-part test in *DAK Industries* under 11 U.S.C. § 503(b)(1)(A), and thus, its claim

20  under that statute may not be allowed.  Regarding the requirement of the direct and

21  substantial benefit to the estate, the Ninth Circuit stated in *In re Dant & Russell, Inc.,*

22

---

23  [7]  The circumstances of this case are similar to *In re Nichols* in which the Bankruptcy Appellate Panel
affirmed the judgment of the bankruptcy court disallowing the administrative expense claim under 11
24  U.S.C. § 503(b)(1)(A).  *In re Nichols*, BAP No. AZ-09-1326 PaDJu, 2010 WL 6259965 at *7-8. In that
case, after a no asset report was made by the Chapter 7 trustee, which was then rescinded, and a sale of
25  estate property occurred, Debtor's expense for maintenance of the subject real property was not an
administrative expense because, among other reasons, the expenses had not been paid based on any
26  transaction with the trustee, the expenses were incurred for debtor, the occupant's, personal benefit, and
not for the benefit of the bankruptcy estate.  *Id.* at *2.  The bankruptcy court in that case noted on the
27  record: "The reason that I can't find that it[']s an administrative expense is simply the trustee never
authorized it, the trustee never knew about it, to have to come in now seven, eight, nine years later and
28  try to figure out whether it was reasonable or not, that's why, you know, you have to try to work these
things through. . . . If the Debtor did make these payments she was a volunteer because she did not have
the right, without the trustee's consent, to incur the costs."  *Id.* at *3.

1    853 F.2d 700 (9th Cir. 1988):

2        Section 503(b)(1)(A) provides as follows:

3        (b) After notice and a hearing, there shall be allowed, administrative expenses ...
4        including ... the actual, necessary costs and expenses of preserving the estate,
         including wages, salaries, or commission for services rendered after the
5        commencement of the case[.]

6        The statute is explicit. Any claim for administrative expenses and costs must be
7        the actual and necessary costs of preserving the estate for the benefit of its
         creditors. *Matter of Baldwin-United Corporation*, 43 B.R. 443, 451 (S.D. Ohio
8        1984). The terms "actual" and "necessary" are construed narrowly so as "to keep
         fees and administrative costs at a minimum."*8 In re O.P.M. Leasing Services,*
9        *Inc.*, 23 B.R. 104, 121 (Bankr.S.D.N.Y.1982); *see also* 3 Collier on Bankruptcy, ¶
10       503.04, at 503-23 (15th ed. 1988). An actual benefit must accrue to an estate.
         *See In re McKeesport Steel Castings Co.* (*Equitable Gas Co. v. Equitable N.A.,*
11       799 F.2d 91, 94-95 (3rd Cir.1986)) (postpetition gas services were properly
12       ordered paid to utility as an administrative expense necessary to preserve going
         concern value of Chapter 11 debtors estate); *Broadcast Corp. of Georgia v.*
13       *Broadfoot*, 54 B.R. 606, 611 (N.D.Ga.1985) ("The mere potential of benefit to the
         estate does not satisfy this requirement"). Additionally, keeping costs to a
14       minimum serves the overwhelming concern of the Code: Preservation of the
15       estate. *Otte v. United States*, 419 U.S. 43, 53, 95 S.Ct. 247, 254, 42 L.Ed.2d 212
         (1974); *see also Randolph v. Scruggs*, 190 U.S. 533, 537-39, 23 S.Ct. 710, 712,
16       47 L.Ed. 1165 (1903). This limitation is necessary to protect the limited assets of
17       the estate for the benefit of the unsecured creditors' interests and is particularly
         important in a Chapter 11 case where a partial liquidation is necessary to
18       facilitate reorganization.

19   *Id*. at 706.

20       The Ninth Circuit Bankruptcy Appellate Panel in *In re Sierra Pacific Broadcasters*,

21   185 B.R. 575, 577 (9th Cir. BAP 1995) identified the key sentence in the Ninth Circuit's

22   opinion in *In re Dant & Russell, Inc*., for allowing an administrative expense claim under

23   11 U.S.C. § 503(b)(1)(A):  "Any claim for administrative expenses and costs must be the

24   actual and necessary costs of preserving the estate for the benefit of its creditors."  *Id*.,

25   *citing and quoting*, *In re Dant & Russell, Inc., 853* F.2d at 706.  In commenting on *In re*

26   *Dant & Russell, Inc*., the Bankruptcy Appellate Panel observed:

27       In *Dant & Russell*, the Ninth Circuit stated, "[t]he statute is explicit. Any claim for
         administrative expenses must be the actual and necessary costs of preserving
28       the estate for the benefit of its creditors." *Id*. at 706 (emphasis added). The
         reference to the "benefit of its creditor[s]" is not in § 503(b)(1)(A). Rather than

> requiring an actual benefit to the estate, the language only requires that the conduct involved in attempting to preserve the estate must be for the "benefit" of the estate as opposed to the benefit of some other entity. For example, postpetition expenses which benefitted a third party would not be entitled to an administrative expense. *See e.g. In re Leedy Mortgage Co., Inc*., 111 B.R. 488, 493 (Bankr.E.D.Pa.1990) (stating that the cost incurred to benefit the claimants' own interest is not entitled to administrative priority).
>
> In *Dant & Russell*, the issue involved a claim for an administrative expense priority by the debtor's lessor for environmental cleanup costs on property which had been leased by the debtor. The lease was rejected by the debtor in possession shortly after bankruptcy pursuant to [11 U.S.C.] § 365(g). Since the effect of rejection under § 365(g) is to treat the breach of an unexpired lease as occurring prepetition, the Ninth Circuit concluded that the damages also occurred prepetition. Thus, the claim was not entitled to an administrative expense priority. The Ninth Circuit did note, however, that the result would be different if the contaminated property were property of the estate. 853 F.2d at 709. In that case, the claimant would have been entitled to an administrative expense priority.

*Id*. Thus, to qualify as an administrative expense under 11 U.S.C. § 503(b)(1)(A), the expenses must not be incurred with the intent to benefit the person making the expenditure. *In re Nichols*, BAP No. AZ-09-1326 PaDJu, 2010 WL 6259965 at *7, citing, *In re Sierra Pacific Broadcasters*, 185 B.R. at 577 (holding that the cost incurred to benefit the claimants' own interest is not entitled to administrative priority under § 503(b)(1)(A)); *In re Leedy Mortgage Co., Inc*., 111 B.R. 488, 493 (Bankr. E.D. Pa. 1990) (same).

Similarly, the district court in this judicial district in *In re Forrest*, 611 B.R. 662 (C.D. Cal. 2019) affirmed the judgment of this bankruptcy court which had held that the debtors in a Chapter 7 bankruptcy case did not have an allowable administrative expense claim under 11 U.S.C. § 503(b)(1)(A) for paying home related expenses post-petition, including mortgage payments and property taxes, because the expenses did not primarily benefit the bankruptcy estate or trustee, but benefitted the debtors themselves, allowing them to continue to live at the property.  *Id*. at 667-669.

The evidence in this case does show that Data Leverage made expenditures relating to the property, such as payment of delinquent property taxes on the property,

1    and mortgage payments on the property, including arrearages on the senior lien held by

2    Selene Finance. [8]   Regardless, the evidence in this case shows that Data Leverage's

3    expenditures, whether substantiated or not, were made for its own benefit or for the

4    benefit of the Debtor, Machevsky, to facilitate Data Leverage's own interests in

5    purchasing the property from the debtor pursuant to their agreement, and not with the

6    intent to benefit the bankruptcy estate or the creditors in this case.  In making these

7    expenditures, Data Leverage intended to act in its own interests, and the expenses

8    were incurred with the intent to benefit the person making the expenditures, Data

9    Leverage, which do not qualify such expenditures as for the benefit of the creditors of

10   the bankruptcy estate as allowable administrative expenses pursuant to 11 U.S.C. §

11   503(b)(1)(A).  Accordingly, the court determines that the claimed expenditures of Data

12   Leverage do not meet the second prong of direct and substantial benefit to creditors

13   under the two-part test in *DAK Industries*, and therefore, the expenditures are not

14   allowable administrative expenses under 11 U.S.C. § 503(b)(1)(A).

15          C.   11 U.S.C. § 503(b)(3)(D)

16          Data Leverage alternatively relies upon 11 U.S.C. § 503(b)(3)(D) for its

17   administrative expense claim. 11 U.S.C. § 503 provides in pertinent part:

18          (a) An entity may file a timely request for payment of an administrative expense,
             or may tardily file such request if permitted by the court for cause.
19

20          (b) After notice and a hearing, there shall be allowed administrative expenses. . .
             including—
21                                          *   *   *

22          (3) the actual, necessary expenses, other than compensation and
             reimbursement specified in paragraph (4) of this subsection, incurred by---
23
                                       *   *   *
24          (D) a creditor, an indenture trustee, an equity security holder, or a
             committee representing creditors or equity security holders other
25          than a committee appointed under section 1102 of this title, in

26

27   [8] Data Leverage may have incurred other expenses, such as legal fees spent on behalf of the Debtor in
     his litigation with Binafard about the latter's specific performance claim, and for due diligence investigation
28   by Linton at the County Recorder's office, but these expenses were not substantiated and are no longer
     being requested by Data Leverage.  Data Leverage's Brief Following Evidentiary Hearing, Docket No.
     185, filed on June 23, 2021, at 5.

making a substantial contribution in a case under chapter 9 or 11 of this title;

\* \* \*

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement of actual, necessary expenses by such attorney or accountant; . . . .

11 U.S.C. § 503(a), (b)(3)(D) and (b)(4).

As stated earlier, Data Leverage argues that its expenditures qualify as allowable administrative expense claims under 11 U.S.C. § 503(b)(3)(D) by "preventing a foreclosure or tax sale of the Real Property by advancing the funds necessary to rescue the property . . . and the other expenditures by Data Leverage provided a substantial contribution to the estate."  Motion at 7.  That is, as argued by Data Leverage, "If Data Leverage had not rescued the Real Property in 2018 and 2019, there would be no property for the estate to liquidate and distribute to creditors today."  *Id*. at 7.  The Chapter 7 trustee disagrees with Data Leverage's arguments that its expenditures are allowable under 11 U.S.C. § 503(b)(3)(D) and makes three counterarguments: (1) Data Leverage may not rely upon 11 U.S.C. § 503(b)(3)(D) because the statute only expressly applies to Chapter 9 and 11 bankruptcy cases, not Chapter 7 cases like this one, and "Movant is not the type of applicant provided in the statute;" (2) there is no admissible evidence to substantiate that Data Leverage made the payments that paid the mortgage or indebtedness on the property; and (3) the expenditures were unnecessary to preserve the estate because the bankruptcy case could have been reopened and the automatic stay would have protected the estate from foreclosure or tax sale.  Opposition at 4-8, 10-11.

The primary legal dispute between the parties regarding Data Leverage's claim under 11 U.S.C. § 503(b)(3)(D) is whether the statute applies to Chapter 7 bankruptcy case.  By its express terms, 11 U.S.C. § 503(b)(3)(D) only applies to cases under

1   Chapters 9 and 11 of the Bankruptcy Code, not Chapter 7 cases as the statutory

2   language refers to "in making a substantial contribution in a case under chapter 9 or 11

3   of this title." 11 U.S.C. § 503(b)(3)(D). There is no reference to Chapter 7 in this

4   statutory language. *Id*. The case law is divided on the issue, and there is no controlling

5   case law in the Ninth Circuit at this time. [9]

6       Data Leverage relies upon a Sixth Circuit decision in *Mediofactoring v.*

7   *McDermott* (*In re Connolly North America, LLC*), 802 F.3d 810, 822 (6th Cir. 2015),

8   which held that the court may allow administrative expense claims under 11 U.S.C. §

9   503(b)(3)(D), stating that ". . . by using the term 'including' in the opening lines of the

10  subsection, Congress built a mechanism into § 503(b) for bankruptcy courts to

11  reimburse expenses not specifically mentioned in § 503(b)'s subsections." *Id*. at 816.

12  The panel decision in *In re Connolly North America, LLC* was not unanimous in

13  overruling the bankruptcy court's claim disallowance based on its statutory interpretation

14  as one judge dissented. *Id*. at 819-825 (O'Malley, J., dissenting). The majority

15  disagreed with the dissent's objection that allowing such claims in Chapter 7 cases

16  would render the language expressly referring to allowing such claims in Chapter 9 and

17  11 cases would violate a fundamental canon of statutory interpretation by rendering

18  such express statutory language superfluous. *Id*. at 817-818. The majority reasoned

19  that use of the word "including" in § 503(b) meaning "not limiting" encouraged an

20  expansive reading of § 503(b) and furthered the policy aims of the statute. *Id.* at 816.

21  According to the majority, Congress was "fully capable" of excluding claims in Chapter 7

22  cases, but did not so exclude, stating that such policy balancing is for Congress rather

23  than the courts:

---

[9] The court notes that the Chapter 7 trustee cited in his briefing the unpublished opinion of the Bankruptcy Appellate Panel in *In re United Education & Software*, BAP No. CC-05-1067-MaMeP, 2005 WL 6960237 at *5 (9th Cir. BAP Oct. 7, 2005) (stating "The proper interpretation of § 503(b)(3)(D) is that it does not authorize administrative priority for expenses incurred in a chapter 7 case or after a case has been converted from chapter 11 to chapter 7."). *See* Opposition at 11. The court does not rely upon this unpublished authority because the opinion itself states that pursuant to 9th Cir. BAP Rule 9013-1, then in effect, it may not be cited except when relevant under the doctrines of law of the case, res judicata or collateral estoppel, which exceptions are not applicable here. *In re United Education & Software,* BAP No. CC-05-1067-MaMeP, 2005 WL 6960237 at *1 n. 2.

1
2
3
4
5
6
7
8

Without doubt, balancing policy concerns in the bankruptcy arena is entrusted to Congress. Our job as a court is simply to respect the intended meaning of the Bankruptcy Code and enforce that meaning, leaving Congress to assess the outcome. But in discerning that intended meaning, we properly look to the overall intent and purpose of the Code. Failing to award administrative expenses to the rare Chapter 7 creditors who are forced by circumstances to "tak[e] action that benefits the [bankruptcy] estate when no other party is willing or able to do so," would deter them from participating in bankruptcy cases and proceedings, which is plainly inconsistent with the purposes of the Act. This militates in favor of interpreting § 503(b) to embrace reimbursement of administrative expenses in cases such as this one and § 503(b)(3)(D) as not divesting the bankruptcy courts of the authority to do so.

9

*In re Connolly North America, LLC*, 802 F.3d at 818.

10
11
12
13

Several other courts, including two bankruptcy courts in the Ninth Circuit, are in accord with the Sixth Circuit's decision in *In re Connolly North America*, LLC.  *In re Maqsoudi*, 566 B.R. 40 (Bankr. C.D. Cal. 2017); *In re Maust Transport, Inc.,* 589 B.R. 887 (Bankr. W.D. Wash. 2018); *In re Javed*, 592 B.R. 615 (Bankr. D. Md. 2018).

14
15
16

In *Maqsoudi*, another judge of this court noted that the question posed by a substantial contribution claim in a Chapter 7 bankruptcy case as framed by the Sixth Circuit in *In re Connolly North America, LLC* was as follows:

17
18
19
20

The question, therefore, is whether the inclusion of the 'substantial contribution in a case under chapter 9 and 11' language in subsection (b)(3)(D) negates the meaning of 'including' in the introductory provision of § 503(b) and divests bankruptcy courts of the authority to allow reimbursement of administrative expenses incurred by a Chapter 7 creditor who makes a substantial contribution to the debtor's estate.

21
22
23
24
25
26
27
28

*In re Maqsoudi*, 566 B.R. at 44, *quoting In re Connolly North America, LLC*, 802 F.3d at 816.  The court in *Maqsoudi* resolved the issue by its reliance on the Ninth Circuit's opinion in *In re Mark Anthony Construction, Inc*., 886 F.2d 1101 (9th Cir 1989) in which the Ninth Circuit concluded that the canon of statutory interpretation of *expression unius est exclusion alterius* did not apply to 11 U.S.C. § 503(b) by use of the word "including" and held that post-petition interest on an administrative expense claim also be given first priority status as the underlying claim.  The *Mark Anthony Construction* opinion as quoted by the *Maqsoudi* court stated:

1
2
3
4
5

The text of section 503 immediately presents two seemingly contradictory aspects. The resolution of this apparent contradiction is central to our conclusion. On the one hand, the section lists a series of expenses which should be treated as first priority administrative expenses. When a statute sets forth a series of items included under a general rule, the canon of *expression unius est exclusion alterius*, under which a court infers an intention to make the statute's application restricted and limits the application of the statute to the specific listed examples, is often deemed applicable.

6
7
8
9
10
11

On the other hand, the structure of section 503(b) is inconsistent with a restrictive interpretation of its list of administrative expenses; the statute states that "there shall be allowed administrative expenses, ... including-" and then lists (in subsections (1)–(5)) a series of expenses. In construing a statute, the use of a form of the word "include" is significant, and generally thought to imply that terms listed immediately afterwards are an inexhaustive list of examples, rather than a bounded set of applicable items. In fact, at least one court has relied upon this interpretation of "including" to conclude that post-petition interest should properly be given first priority as an administrative expense.

12
13
14

The Bankruptcy Code specifically provides that "including" is not a limiting term when used in the Code. Especially in light of this unambiguous general directive, we conclude that the administrative expense statute's use of "including" renders the expression unius rule inapplicable to section 503.

15
16
17
18
19
20
21
22
23

*In re Mark Anthony Construction, Inc*., 886 F.2d at 1106 (citations and footnote omitted), quoted in *In re Maqsoudi*, 566 B.R. at 45.  Based on this language, which the court in *Maqsoudi* said was binding, the court held: "In a situation, such as here, where a creditor has made a substantial contribution to a Chapter 7 case, the Bankruptcy Court has discretion to allow an administrative expense in accordance with the equities of the case. Here, Applicant substantially assisted the Trustee in successfully maintaining an adversary proceeding that resulted in the recovery and sale of property which produced a surplus estate." *Id*. at 45. [10]  In this case, Data Leverage argues that the court should

24
25
26
27
28

---

[10] In *Maqsoudi,* the court in a Chapter 7 bankruptcy case allowed, pursuant to 11 U.S.C. § 503(b)(3)(D), the substantial contribution claim of a secured creditor whose assistance helped the trustee in recovering an undisclosed real property asset for the bankruptcy estate through an adversary proceeding brought by the trustee.  566 B.R. at 42-46.  While the creditor did not recover any property as the trustee maintained the adversary proceeding that led to its recovery, the court found with the trustee's concurrence that the creditor provided important assistance to support a substantial contribution claim.  *Id.* at 43.  However, the court reduced the claim only to allow expenses that benefitted the estate and not allow expenses that only benefitted the creditor.  *Id.* at 45-46.

consider the statements in *Mark Anthony Construction* to find similarly that the

categories recited in 11 U.S.C. § 503(b)(3)(D) are not exhaustive due to use of the word

"including" in § 503(b) and that the resultant nonexhaustive listing of allowed expenses

due to the use of the word "including" does not exclude the allowance of an

administrative expense for a substantial contribution in a Chapter 7 case under 11

U.S.C. § 503(b)(3)(D).  Motion at 10.

The court in *Maust Transport* also concluded that substantial contribution claims

may be allowed in Chapter 7 cases under 11 U.S.C. § 503(b)(3)(D).  589 B.R. at 897-

900.  The court discussed and relied upon the Ninth Circuit's holding in *Mark Anthony*

*Construction* that the rule of exclusion *unius est exclusion alterius* was inapplicable to §

503(b), but the situation of allowing substantial contribution claim in a Chapter 7 case

pursuant to 11 U.S.C. § 503(b)(3)(D) did not squarely fall within its specific holding that

interest on tax claims allowed as administrative expenses, though not specifically

included in § 503(b)(1)(B) and (C), will be given the same administrative expense status

based on pre-1978 Bankruptcy Code case law in *Nicholas v. United States,* 384 U.S.

678 (1966).  *Id.* at 897-898. [11]  Consequently, the court concluded that "as there does

---

[11]  The court in *Maust Transport* explained its reliance on *Mark Anthony Construction* to hold that substantial contribution claims are allowed in Chapter 7 cases despite the absence of a specific reference to Chapter 7 as follows:

> While the Ninth Circuit Court of Appeals ("Ninth Circuit") has not ruled on the specific issue pending before this Court, it did reject the use of the doctrine of *expressio unius est exclusio alterius* relied on by several courts, including the Ninth Circuit Bankruptcy Appellate Panel ("BAP") in the unpublished decision, *United Educ. & Software*, 2005 WL 6960237, at *4, in holding that interest should be included as part of a tax administrative claim though interest was not included in the specific types of items referenced in connection with tax claims allowed as administrative claims under § 503(b)(1)(B) and (C). *In re Mark Anthony*, 886 F.2d at 1106. The *Mark Anthony* panel reached this conclusion based upon the existence of the pre-Code U.S. Supreme Court decision, *Nicholas v. United States*, 384 U.S. 678, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966), allowing interest on such claims, which the panel concluded had not been expressly abrogated by the enactment of the 1978 Bankruptcy Code. In so doing, the Ninth Circuit noted generally that "[e]specially in light of this unambiguous general directive, we conclude that the administrative expense statute's use of 'including' renders the *expressio unius* rule inapplicable to section 503." *Mark Anthony*, 886 F.2d at 1106. While the current case does not fall squarely within the specific holding of the *Mark Anthony* case, as there does not appear to be any circuit or pre-Code law specifically supporting the allowance of a Chapter 7 substantial contribution claim, this Court agrees with the general proposition of the Ninth Circuit's reasoning in that case: the list of expenses is not restrictive, and absent a clear intention to disallow a type of expense, such expenses should rise or fall based on the facts of the case and other guiding caselaw.

589 B.R. at 898.

not appear to be any circuit or pre-Code law specifically supporting the allowance of a

Chapter 7 substantial contribution claim, this Court agrees with the general proposition

of the Ninth Circuit's reasoning in that case: the list of expenses is not restrictive, and

absent a clear intention to disallow a type of expense, such expenses should rise or fall

based on the facts of the case and other guiding caselaw."  *In re Maust Transport, Inc.*,

589 B.R. at 898.

The court in *Maust Transport* then cited and discussed the Sixth Circuit's opinion

in *Connolly* with approval:

> The Sixth Circuit Court of Appeals ("Sixth Circuit") in *Connolly* similarly recently
> reached this conclusion in holding that an interpretation that limits the application
> of § 503(b)(3)(D) to only Chapters 9 and 11, negates the term "including" that
> appears at the beginning of § 503(b). "[B]y using the term 'including' in the
> opening lines of the subsection, Congress built a mechanism into § 503(b) for
> bankruptcy courts to reimburse expenses not specifically mentioned in § 503(b)'s
> subsections." *Connolly*, 802 F.3d at 816. Furthermore, there is nothing in the
> Code specifically excluding such administrative claims in a Chapter 7. The use of
> the term "including" indicates an intent that the categories listed in the statute not
> be exhaustive and that the terms be flexible and adaptable to the unique
> circumstances of each case. In addition, the legislative history of this section
> indicates that Congress's intent in enacting subsection (b)(3)(D) was to resolve a
> problem that was occurring in Chapters 9 and 11, not to exclude the allowance of
> such fees in the rare Chapter 7 case to which it would be applicable. Further,
> Congress could have specifically stated that such claims are never allowed in
> Chapter 7, 12 or 13, but it did not. *In re Connolly*, 802 F.3d at 816; *see infra*
> discussion re: 2005 Amendments p. 893.

*In re Maust Transport, Inc.*, 589 B.R. at 898.

Relying upon *Mark Anthony Construction* and *Connolly*, the court in *Maust*

*Transport* concluded:

> The purpose of § 503(b)(3)(D) is to encourage creditors in whatever chapter a
> bankruptcy case is filed to "substantially contribute" to the estate by pursuing
> funds that will be available for distribution to claimants. If the particular facts of a
> case warrant reimbursement, the court should have the ability to fashion a
> remedy that will foster rather than hinder such actions for the benefit of the
> estate. While it is true, that in cases where there is a trustee, the allowance of
> such claims will be rare and such allowed substantial contribution claims should
> be limited to avoid overlap and duplication of efforts with those of the trustee,
> there are cases where for any number of reasons a creditor may still provide a
> "substantial contribution."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Id.* at 898-899.  In *Maust Transport*, the court found that the circumstances of the case presented the "rare" case in which a substantial contribution claim may be allowed under 11 U.S.C. § 503(b)(3)(D) where the creditor incurred attorneys' fees and costs in pursuing a fraudulent transfer claim that was a substantial contribution to the estate in obtaining a monetary recovery where the trustee lacked the resources to pursue the litigation, and the court allowed a substantial contribution claim of the creditor in a Chapter 7 case.  *Id.* at 899-901.

The view that a substantial contribution claim may be allowed in a Chapter 7 bankruptcy case under 11 U.S.C. § 503(b)(3)(D) is a minority view as recognized by the court in *In re Concepts America, Inc.*, 625 B.R. 881 (Bankr. N.D. Ill. 2021), [12] citing other cases constituting the majority view, including *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994); *In re HealthTrio, Inc.*, 599 B.R. 119, 132 (D. Colo. 2019); *In re Fontainebleau Las Vegas Holdings, LLC*, 574 B.R. 895 (Bankr. S.D. Fla. 2017); *Matter of Memory Lane Assisted Living of Bowdon LLC*, No. 15-10373-WHD, 2017 WL 3475663 (Bankr. N.D. Ga. Aug. 11, 2017); *In re Watson*, 495 B.R. 88 (Bankr. D. Colo. 2013); *In re Lambert*, No. 04-30394-WRS, 2010 WL 3927067 (Bankr. M.D. Ala. Oct. 5, 2010); *In re Courtney*, 359 B.R. 883, 887 n. 2 (Bankr. E.D. Tenn. 2007); *In re Hackney*, 351 B.R. 179 (Bankr. N.D. Ala. 2006); *see also, In re Engler,* 500 B.R. 163, 174 (Bankr. M.D. Fla. 2013) ("The Court, however, joins the other courts that have recognized that '[w]hen a subsection directly addresses the type of administrative expense sought, the restrictions in it cannot be avoided by appealing to the non-exclusive nature of § 503(b).") (footnote and citations omitted); *Ronnie Desormeaux LLC v. Sikes,* Case No. 2:20-CV-01472, __ B.R. ___, 2021 WL 1844260 (W.D. La. May 7, 2021) (creditor lack standing to assert substantial contribution claim for expenses incurred during Chapter 7

---

[12] *Concepts America* involved a substantial contribution claim of a creditor who was one of the petitioning creditors filing an involuntary Chapter 7 bankruptcy petition against the debtor, which later consented to entry of an order for relief, and the creditor sought payment in the amount of $241,521.26 for investigative work which it contended made a substantial contribution to the case, but based on its reading of 11 U.S.C. § 503(b)(3)(D) as discussed herein, the court disallowed the claim on grounds that substantial contribution claims are not allowed in a Chapter 7 bankruptcy case.  625 B.R. at 883-884.

phase of bankruptcy case after conversion from Chapter 11 based on plain language of

11 U.S.C. § 503(b)(3)(D)); *In re Lloyd Securities, Inc.,* 75 F.3d 853, 856-858 (3rd Cir.

1996) (customers of failed securities dealer and their attorneys applied for attorneys'

fees and costs from res created by dealer's liquidation under Securities Investor

Protection Act (SIPA) lack standing to assert substantial contribution claim because

SIPA incorporates the section of Bankruptcy Code governing allowance of

administrative expenses in 11 U.S.C. § 503(b), the customers' expenses would not be

recoverable in Chapter 7 proceeding under 11 U.S.C. § 503(b)(3)(D) based on plain

language referring only to Chapter 9 and 11 cases, and thus, they were not recoverable

in SIPA liquidation proceeding); 4 Levin and Sommer, *Collier on Bankruptcy,*

¶ 503.10[5] (16th ed. online 2021 update) (expressing the view that the cases not

allowing substantial contribution claims represents the majority view, citing a number of

the cases cited above).

 The court in *Concepts America, Inc.*, opined that the majority view is correct

because it is based on the plain language of the statute:

> The text of § 503(b)(3)(D) is plain and unambiguous. An administrative expense claim will be allowed to "a creditor ... in making a substantial contribution in a case under chapter 9 or 11 of this title[.]" Congress did not include Chapter 7 in § 503(b)(3)(D). Therefore, the court's inquiry could end here. "The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *U.S. v. Ron Pair Enterprises, Inc*., 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quotation omitted). *See Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.") (quotation omitted).

> Other courts have concluded that the plain language of § 503(b)(3)(D) prohibits substantial contribution claims in Chapter 7. *See In re HealthTrio, Inc*., 599 B.R. 119, 132 (D. Colo. 2019) ("Based on the plain language of the statute and the absence of any ambiguity, this Court agrees with the majority view that it would be unreasonable to apply a section 503(b)(3)(D) analysis to Chapter 7 and create an administrative expense category in Chapter 7 cases based on 'substantial contribution.' ") (quotation omitted); *In re Dorado Marine, Inc*., 332 B.R. 637, 640 (Bankr. M.D. Fla. 2005) ("The plain language of the statute provides for payment of expenses incurred in contributing to a case 'under chapter 9 or 11 of this

title.' ").

There is no evidence that limiting substantial contribution claims to Chapters 9 and 11 would be demonstrably at odds with Congressional intent. *See In re Peterson*, 152 B.R. 612, 614 (D.S.D. 1993) ("Although the parties speculate as to the reasons why Congress did not include the other bankruptcy chapters in § 503(b)(3)(D), the Court is not going to engage in speculation and attempt to divine congressional wisdom. For whatever reason, Congress chose not to include reference to those other chapters in § 503(b)(3)(D).").

*In re Concepts America, Inc.*, 625 B.R.at 885-886.

The court in *Concepts America, Inc.* further opined that the majority view is correct because to ignore the express language of 11 U.S.C. § 503(b)(3)(D) that substantial contributions are allowed under "'chapter 9 or 11 of this title" would render that phrase superfluous:

Other canons of statutory construction compel this same result. First, Congress chose to include the words "under chapter 9 or 11" in § 503(b)(3)(D). It could have written the statute to state that a creditor who makes "a substantial contribution in a case" can apply for an administrative expense claim, making no reference to any chapter of the Bankruptcy Code. As an example, we need look no further than the two subsections that immediately precede § 503(b)(3)(D). Neither of those subsections are limited to cases under certain chapters of the Bankruptcy Code. 11 U.S.C. §§ 503(b)(3)(B) and (b)(3)(C).

What would be the purpose of the Congressional decision to include the phrase "under chapter 9 or 11" except to limit substantial contribution claims to cases under those chapters? To ignore those five words is to violate "one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]" *Corley v. United States*, 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) (quotation omitted). *See Peterson*, 152 B.R. at 614 (footnote omitted) ("[I]f a creditor who makes a substantial contribution in a Chapter 12 proceeding is entitled to compensation for its expenses under § 503(b), the phrase 'in a case under Chapter 9 or 11 of this title' in subsection (3)(D) would be merely excess verbiage.").

*Id.* at 886-887.

As to the use of the word "including" in the beginning of 11 U.S.C. § 503(b), the court in *Concepts America* acknowledged that the universe of possible administrative expenses is not limited to the nine enumerated examples in the statute, but while the

category of allowed expenses in § 503(b)(1)(A) are not limited to the listed examples,

the other categories in § 503(b) are limited by the specific words used in each

subsection, which do not use the word "including," and among these subsections is §

503(b)(3)(D).  *In re Concepts America, Inc.,* 625 B.R. at 889-891.  As the court

explained:

> This court agrees that, by using the word "including" in the beginning of § 503(b), Congress signaled that the universe of possible administrative expenses is not limited to the nine enumerated examples in the statute. See In re Enloe, No. 14-36358, 2016 WL 4595921, at *2 ("[T]here is broad consensus that the categories listed under § 503(b) as allowable categories of administrative expenses are not exhaustive."). But see *In re Lehman Brothers Holdings Inc.*, 508 B.R. 283, 289 (S.D.N.Y. 2014) ("Although § 503 introduces its list with the term 'including,' which implies that the list is not exhaustive or exclusive, the list is meant to be illustrative of the whole universe of administrative expenses.") (citations omitted).
>
> Administrative expense claims are not limited to the nine categories in § 503(b). The *Connolly* panel, however, awarded too broad of a reach to the use of "including" in the prefatory sentence of § 503(b). Unlike *Connolly*, this court concludes that, with two exceptions, each of the nine categories in § 503(b) is limited to the specific situation it describes.
>
> ***
>
> In contrast to § 503(b)(1)(A), only one of the other eight categories in § 503(b) contains the word "including." The other seven do not; they are therefore limited to the situations described. This is also true for the six subcategories of actual, necessary expenses in § 503(b)(3). See *In re Mountain Creek Resort, Inc.*, 616 B.R. 45, 54 (Bankr. D.N.J. 2020) ("Congress's use of the term 'including' in subsections (b) and (b)(1) indicates that those specific subsections are not limited. On the other hand, subsection (b)(3)(D) is extremely limited to a list of defined categories."). See also *In re Nilhan Developers, LLC*, 620 B.R. 385, 409 (Bankr. N.D. Ga. 2020) ("the statute is very specific about the type of entity that may file substantial contribution claims in a chapter 11 case under Section 503(b)(3)(D) and (b)(4)").
>
> Each of those subsections of § 503(b)(3) must be analyzed according to the words Congress chose for the potential allowance of an administrative expense, always keeping in mind that such expenses are construed narrowly. See *Matter of Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir. 1984) (citations omitted) ("[B]ecause priority should not be afforded unless it is founded on a clear statutory purpose, if the appellants' claim does not comport with the language and underlying purposes of § 503, their claim must fail. Any preference for claims not intended by Congress to have priority would dilute the value of the intended priority and

1
2
3

thus frustrate the intent of Congress."). See also *Matter of Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 658 F.2d 1149, 1163 (7th Cir. 1981) ("If one claimant is to be preferred above others, the purpose should appear from the pertinent statutes.")

4

*In re Concepts America, Inc.,* 625 B.R. at 889-890 (footnote omitted).

5
6
7

The court in *Concepts America* further opined that the specific language of subsection 503(b)(3)(D) controls over the general language of section 503(b) based on the canon of statutory construction that "the specific governs the general":

8
9
10
11
12
13

Second, the Bankruptcy Code is a comprehensive statutory scheme. In such situations we presume that Congress "has deliberately targeted specific problems with specific solutions." *Varity Corp. v. Howe*, 516 U.S. 489, 519, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (Thomas, J., dissenting). Under the established canon "of statutory construction that the specific governs the general," *RadLAX*, 566 U.S. at 645, 132 S.Ct. 2065 (quotation omitted), the general authorization for allowance of administrative expenses in § 503(b) is limited by the specifically defined boundaries of § 503(b)(3)(D).

14
15
16
17
18
19
20
21
22

"The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission." *Id*. Such is the case here. The statutorily defined contours of a substantial contribution claim are described in § 503(b)(3)(D). Allowing creditors recourse to the general language of § 503(b) ignores the specific solution Congress designed. "In the context of § 503(b)(3)(D), the general authorization provided by the expansive term 'including' is limited by the specific authorization of the phrase 'in a case under chapter 9 or 11 of this title.' The Court will not render the specific authorization superfluous by allowing the general to control." *HealthTrio*, 599 B.R. at 132 (quotations omitted). See also *In re Elder*, 321 B.R. 820, 829 (Bankr. E.D. Va. 2005) ("[W]hen a subsection directly addresses the type of administrative expense sought, the restrictions in it cannot be avoided by appealing to the non-exclusive nature of § 503(b)."); *In re Beale*, 358 B.R. 744, 748 (Bankr. N.D. Ill. 2006) (agreeing with *Elder*).

23
24
25
26
27
28

*Id*. at 887.  Thus, the court in *Concepts America* concluded that the Sixth Circuit's holding in *Connolly North America* simply based on the use of the word "including" in the beginning of § 503(b) is too broad.  This reasoning also explains why the Ninth Circuit's specific holding in *Mark Anthony Construction* is not controlling in this situation. *See In re Maust Transport, Inc*., 589 B.R. at 898 (holding that *Mark Anthony Construction* is not controlling on the issue of allowing substantial contribution claims in

1    Chapter 7 cases under 11 U.S.C. § 503(b)(3)(D), though the court found it persuasive).

2         The court determines that the majority view as expressed in *Concepts America*

3    and the dissent in *Connolly North America* is better reasoned than the minority view as

4    expressed by the majority in *Connolly*.  The plain language of 11 U.S.C. § 503(b)(3)(D)

5    specifically refers to the statute being applicable to Chapter 9 and 11 cases and to allow

6    it to be applicable in other chapters would render that language superfluous.  The use of

7    the word "including" in the beginning of 11 U.S.C. § 503(b) indicates that the list of

8    allowed expenses is not limited to the enumerated list, but the specific allowed

9    examples under the subsections of 11 U.S.C. § 503(b)(2)-(8), which specifically

10   includes 11 U.S.C. § 503(b)(3)(D), do not use the word "including" to denote that the

11   allowed expenses under those examples are not limited to the enumerated lists.  The

12   majority view better reflects the general policy of the Bankruptcy Code and the

13   applicable case law that the statute allowing administrative expenses should be strictly

14   construed.  Accordingly, this court adopts the majority view and determines that

15   substantial contribution claims are not allowable in Chapter 7 cases.

16        Regarding the trustee's objection to Data Leverage's substantial contribution

17   claim under 11 U.S.C. § 503(b)(3)(D) that "Movant is not the type of applicant provided

18   in the statute," the trustee's objection has merit.  Opposition at 10. [13]  In order to assert

19   a substantial contribution claim, the claimant must fall within one of three categories: (1)

20   a creditor; (2) an indenture trustee; (3) an equity security holder; or (4) a committee

21   representing creditors or equity security holders other than a committee appointed

22   under 11 U.S.C. § 1102.  11 U.S.C. § 503(b)(3)(D).  Data Leverage must fall within one

23   of these four categories to have standing to assert a substantial contribution claim under

24   11 U.S.C. § 503(b)(3)(D).  Three of the categories can be eliminated as there is no

25   argument that in this case, Data Leverage is an indenture trustee, an equity security

26   holder or a committee representing creditors or equity security holders other than a

27

28   _____

[13]  The trustee did not cite any authority or provide any legal analysis in his opposition to support his
contention that "Movant is not the type of applicant provided in the statute."  Opposition at 10-11.
However, as discussed therein, the trustee's contention is correct.

committee appointed under 11 U.S.C. § 1102.  Thus, Data Leverage must be a creditor in order to have standing to assert a substantial contribution under 11 U.S.C. § 503(b)(3)(D).  *In re Cellular 101, Inc.,* 377 F.3d 1092, 1096 (9th Cir. 2004).  As the Ninth Circuit stated in *In re Cellular 101, Inc:*

> Cellular rightly asserts that two things are required to recover on a § 503(b)[(3)(D)] administrative claim.  First, the claimant must be a creditor of the estate.  Second, the creditor must have made a "substantial contribution" to the bankruptcy plan.

*Id.*  However, Data Leverage does not meet the definition of "creditor" under the Bankruptcy Code, which is set forth in 11 U.S.C. § 101(10).  "Creditor" is a defined term in the Bankruptcy Code under 11 U.S.C. §101(10), which states:

(10) The term "creditor" means—

    (A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;

    (B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or

    (C) entity that has a community claim.

*See also, In re Cellular 101, Inc.,* 377 F.3d at 1096 ("The Bankruptcy Code defines a 'creditor' as an 'entity that has a claim against the debtor.").  The term "creditor" is in contrast to the term "entity" as 11 U.S.C. § 503(a) generally provides: "An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court."  "Entity" is also a defined term in the Bankruptcy Code under 11 U.S.C. § 101(15), which states: "The term 'entity' includes person, estate, trust, governmental unit and United States trustee."  There is no dispute that Data Leverage, a limited liability company, is an entity for purposes of the Bankruptcy Code with standing to file a request for payment of an administrative expense under the general provision of 11 U.S.C. § 503(a).  However, Data Leverage has not shown that it is a creditor or one of the other enumerated parties to have standing to assert a substantial contribution claim under the specific provision of 11 U.S.C. § 503(b)(3)(D).

Data Leverage does not meet the definition of "creditor" under 11 U.S.C. § 101(10) because it does not have a claim against the debtor that arose at the time of or before the order for relief concerning the debtor as its claims are postpetition claims for expenses incurred in 2018 and 2019 long after the petition date in 2014, it does not have a claim of a kind specified in 11 U.S.C. §§ 348(d), 502(f), 502(g), 502(h) or 502(i), but rather it asserts a claim under 11 U.S.C. § 503(b)(1)(A) or (b)(3)(D) and it does not assert a community claim.  Data Leverage has admitted that it is not a creditor as defined by 11 U.S.C. § 101(10) in the Motion.  Motion at 6-7.  As argued by Data Leverage in the Motion,

> Data Leverage['s] claim concerns expenditures which occurred after October 30, 2018, four years after the Debtor filed his chapter 7 case.  All these expenditures are post-petition and none is the type covered by [11 U.S.C.] §101(10)(B) or (C).  The Notice [of Possible Dividend and Order Fixing Time to File Claims under Fed. R. Bankr. P. 3002(c)(5)] specifically instructs "creditors" to file their proofs of claim.  Data Leverage is not a "creditor" under this section and the deadline in this notice did not apply to Data Leverage's administrative expense claim.

*Id*.  Data Leverage having at most a postpetition claim for expenses incurred after the petition claim does not confer standing on it as a "creditor" under the Bankruptcy Code, and therefore, it lacks standing to assert a substantial contribution claim under 11 U.S.C. § 503(b)(3)(D).  *In re St. Mary's Hospital,* 120 B.R. 25, 30-31 (E.D. Pa. 1990) (entity not holding a prepetition claim could not be a creditor with standing to assert a substantial contribution claim under 11 U.S.C. § 503(b)(3)(D); *In re First Baldwin Bancshares, Inc.,* No. 13-00563-11-MAM, 2013 WL 2383660 at *1-2 (Bankr. S.D. Ala. May 30, 2013) (holding while 11 U.S.C. § 503(b) states that an entity can make a claim for administrative expenses, the specific language of 11 U.S.C. § 503(b)(3)(D) limiting the enumerated categories of substantial contribution claimants controls the more general language of § 503(b) on statutory construction grounds); *In re Watson*, 495 B.R. 88, 93-95 (Bankr. D. Colo. 2013) (denying for lack of standing substantial contribution claim of law firm employed as special counsel on contingency fee basis by a corporate Chapter 11 debtor seeking allowance of fees in the Chapter 7 case of corporate debtor's

1   former owner for work in joint adversary proceeding that resulted in settlement

2   benefiting Chapter 7 estate, which was represented by separate counsel, on grounds

3   law firm was not one of the entities listed in 11 U.S.C. § 503(b)(3)(D)); *In re Warner*

4   *Springs Partnership*, 193 B.R. 28, 30 (Bankr. S.D. Cal. 1995) (co-owners of debtor

5   lacked standing to seek expenses for attorneys' fees under §§ 503(b)(3)(D) and (b)(4)

6   because they were not one of the entities listed in 503(b)(3)(D)); *In re Fortune Natural*

7   *Resources Corp.*, 366 B.R. 549, 558 (Bankr. E.D. La. 2007) (firm providing financial

8   consulting services postpetition to Chapter 11 debtor-in-possession not entitled to

9   compensation under fees under 11 U.S.C. §§ 503(b)(3)(D) and (b)(4) in acting for

10  debtor, not for itself as creditor, and in the court's view, should have been employed

11  under 11 U.S.C. § 327); *see also, In re Cellular 101, Inc.,* 377 F.3d at 1096 (stating that

12  a party must be a creditor under 11 U.S.C. § 101(10) to have standing to assert a

13  substantial contribution claim under 11 U.S.C. § 503(b)(3)(D), though creditor standing

14  was not disputed in that case); 4 Levin and Sommer, *Collier on Bankruptcy,* ¶ 503.10[5]

15  (noting that the courts have reached "different conclusions" whether an entity not listed

16  in 11 U.S.C. § 503(b)(3)(D) has standing to assert a substantial contribution claim). [14]

17  _____

18  [14] *Collier* states:

19      Section 503(b)(3)(D) grants an administrative expense priority to the actual, necessary expenses

20      incurred by a creditor, an indenture trustee, an equity security holder or a committee representing
        creditors or equity security holders other than a committee appointed under section 1102 (that is,
        an unofficial committee), in making a substantial contribution in a case under chapter 9 or chapter

21      11.  This section lists specific entities that may seek a substantial contribution award, but courts
        have reached different conclusions in deciding whether an entity has standing to assert a

22      substantial contribution claim.

23  4 Levin and Sommer, *Collier on Bankruptcy,* ¶ 503.10[5].  "Some courts hold that only entities specifically
    listed in section 503(b)(3)(D) may pursue substantial contribution claims."  *Id., citing, e.g., In re First*

24  *Baldwin Bancshares, Inc.,* 2013 Bankr. LEXIS 2200 (Bankr. S.D. Ala. May 30, 2013); *In re Engler,* 70
    C.B.C.2d 781, 500 B.R. 163, 174 (Bankr. M.D. Fla. 2013) (while recognizing that the list of administrative

25  expenses is not limiting, the specifics of subsection 503(b)(3) overcome the general), *appeal dismissed,*
    2014 Bankr. LEXIS 38412 (M.D. Fla. Mar. 24, 2014); *In re Watson,* 495 B.R. 88, 93 (Bankr. D.Colo. 2013)

26  (reference to chapters 9 and 11 in the statute preclude its application to chapter 7). "Courts taking a strict
    view also hold that if a party acquires a claim or equity interest during the case, it may only claim

27  substantial contribution for expenses incurred after it became a creditor or shareholder."  *Id., citing, In re*
    *First Baldwin Bancshares, Inc.,* 2013 Bankr. LEXIS 2200 (Bankr. S.D. Ala. May 30, 2013) (entity that

28  purchased stock in debtor postpetition lacked standing under section 503(b)(3)(D) because the fees and
    expenses were incurred before the entity became an equity security holder); *In re Kidron, Inc.,* 48
    C.B.C.2d 492, 278 B.R. 626 (Bankr. M.D. Fla. 2002) (unsuccessful noncreditor purchaser had standing to

1    Data Leverage is not a creditor with a prepetition claim or an other entity enumerated in

2    11 U.S.C. § 503(b)(3)(D) and thus lacks standing to assert a substantial contribution

3    claim under the statute.  For this reason of lack of standing under the statute alone, the

4    claim should be disallowed.

5        Regarding the trustee's objection to the substantial contribution claim that there

6    is no admissible evidence to substantiate that Data Leverage made the payments that

7    paid the mortgage or indebtedness on the property, Data Leverage has offered

8    sufficient evidence to substantiate its expenditures went to pay the indebtedness on the

9    real property.  First, regarding payment of the arrearages on the senior lien to Selene

10   Finance, Data Leverage has shown that its affiliate, Prenton, Inc., made the payment of

11   $122,572.88 on its behalf to pay the loan arrearages on the senior indebtedness owed

12   to Selene Finance based on the credible testimony of Jennifer Preys, the majority

13   shareholder of Prenton, Inc., and member of Data Leverage, and sister of David Preys,

14   the manager and majority member of Data Leverage and minority shareholder of

15   Prenton, and bank account records showing the wire transfer of that amount to Selene

16

17   ───────────────────
     seek administrative expense claim under section 503(b)(3)(D) only for fees and expenses incurred after it
18   acquired claim and became creditor).  "Other courts have read section 503(b) more expansively and have
     considered substantial contribution claims by parties not listed in the statute."  *Id., citing, Mediofactoring v.*
19   *McDermott (In re Connolly N. Am., LLC)*, 802 F.3d 810, 816-17 (6th Cir. 2015) (over dissent, noting that
     section 102(3) "encourages an expansive reading of § 503(b)," and even the specific mention of chapters
20   9 and 11 in the statute does not necessarily preclude its application in chapter 7); In *re S & Y Enters.*, 480
     B.R. 452, 461 (Bankr. E.D.N.Y. 2012) (although ultimately denying the claim, the court found that
21   noncreditor unsuccessful bidder had standing to assert a substantial contribution claim concluding that
     "section 503(b)'s enumeration of prospective applicants for a substantial contribution administrative
22   expense is illustrative, not exclusive"), aff'd, 2013 U.S. Dist. LEXIS 125965 (E.D.N.Y. Sept. 3, 2013); *In re*
     *Zedda*, 169 B.R. 605, 607 (Bankr. E.D. La. 1994) (allowing substantial contribution fees in a chapter 7
23   case, citing cases coming out both ways); *In re Frog & Peach, Ltd.,* 38 B.R. 307, 310 (Bankr. N.D. Ga.
     1984) (denying substantial contribution claim by unsuccessful purchaser but finding "no outright bar
24   against an administrative claim by a meritorious, non-creditor claimant which has conferred a benefit
     upon the debtor").  The court agrees with the cases that hold that a party must be one of the entities
25   specifically listed in 11 U.S.C. § 503(b)(3)(D) to have standing to assert a substantial contribution claim
     because the specific language of subsection § 503(b)(3)(D) limiting the types of claimants overcome the
26   general language of section 503(b) not so limiting in light of the established canon of statutory
     construction that "the specific governs the general."  *See In re Concepts America, Inc.,* 625 B.R. at 887,
27   *citing, RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 566 U.S. 639, 645 (2012).  Moreover,
     allowance of entities other than those specified in the statute to assert substantial contribution claims
28   would ignore the plain language of the statute and render the specific references superfluous.  *Id.* at 885,
     *citing inter alia, U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290
     (1989) and *Corley v. United States*, 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009).

1  Finance in that amounts and Selene's notice of rescission of its notice of default on the

2  loan.  According to the testimony of Jennifer and David Preys, their companies are

3  interrelated, and Prenton, Inc. advanced the funds to make the payment on behalf of

4  Data Leverage.

5  Second, Data Leverage has substantiated that it made the monthly payments of

6  the loan owed to Selene Finance totaling $17,255.50 as it has contended as supported

7  by the credible trial testimony of David Preys, Data Leverage's manager and majority

8  member, and Tanya Linton, Data Leverage's agent and the bank account records,

9  including copies of cancelled checks showing payment to Selene Finance.

10  Third, Data Leverage has substantiated that it made the payment of the property

11  tax delinquency of $20,774.19 as it has contended as supported by the credible trial

12  testimony of David Preys, Data Leverage's manager and majority member, and Tanya

13  Linton, Data Leverage's agent, and the tax account records, including copies of a

14  cancelled check showing payment to the Los Angeles County Tax Collector.

15  Accordingly, the court finds that Data Leverage has substantiated these

16  expenditures relating to the property, an asset of the bankruptcy estate, which total

17  $160,602.57 and that lack of substantiation is not a basis for disallowance of Data

18  Leverage's claim.

19  Regarding the expenditures were unnecessary to preserve the estate because

20  the bankruptcy case could have been reopened and the automatic stay would have

21  protected the estate from foreclosure or tax sale, the objection has some force because

22  no foreclosure or tax sale had taken place, and it is speculation that one would have

23  occurred, but for Data Leverage's expenditures.  As discussed regarding Data

24  Leverage's claim under 11 U.S.C. § 503(b)(1)(A), Data Leverage did not have the intent

25  to contribute to the bankruptcy estate as it incurred the expenditure for its own interest

26  in facilitating its purchase of the property from the debtor. [15] Thus, in a loose sense,

27

28  _____

[15] The court acknowledges that the case law is divided on the issue of whether the creditor's motivation in
its activities that it engages in to support a substantial contribution claim is relevant under 11 U.S.C. §
503(b)(3)(D).  *See* 4 Levin and Sommer, *Collier on Bankruptcy*, ¶ 503.10[5][a], *citing and comparing*

1  Data Leverage arguably made a contribution to the bankruptcy estate because its

2  expenditures of $160,602.57 paid obligations owed on the real property, an asset of the

3  bankruptcy estate, which arguably had to have been paid anyway by the estate.  It

4  appears that in essence, Data Leverage is making an equitable argument that its

5  expenditures went to reduce the indebtedness owed on property of the estate, and that

6  benefitted the estate, and if not compensated, it would be a windfall to the creditors,

7  which Data Leverage did not intend.

8        However, the court must confine its inquiry to the bounds of the Bankruptcy Code

9  in 11 U.S.C. § 503(b)(3)(D).  The trustee is right in arguing that the bankruptcy case

10  could have been reopened, and then the automatic stay would have protected the

11  estate from foreclosure or tax sale absent a request for relief from stay.  However, the

12  case was not reopened when until July 2019 while Selene Finance had issued its notice

13  of trustee's sale in September 2018 in readiness to foreclose, and then Data Leverage

14  made its payment of the arrearages on the Selene Finance senior loan, and Selene

15  Finance rescinded its notice of default.  The problem here for Data Leverage is to show

16  that its expenditures of $160,602.57 substantially contributed to the benefit of the

17  estate, and this is uncertain.  The bankruptcy case was reopened, and the trustee is

18  administering the estate, including the property, apparently the only asset of value in the

19  estate, which was sold through the bankruptcy case, resulting in net sale proceeds of

20  $133,879.72.  Trustee's Status Report re: Sale, Docket No. 174, filed on February 2,

21  2021.  If as the trustee argues, the estate is administratively insolvent based on

22  allowance of Data Leverage's claim for substantial contribution in the amount of

23  $160,602.57, it is doubtful that there would be a benefit to creditors from an alleged

24

25  _____

26  *Lebron v. Mechem Fin., Inc.,* 27 F.3d 937, 944 (3d Cir. 1994); *In re Lister,* 846 F.2d 55, 57 (10th Cir.
   1988) (efforts undertaken by a creditor solely to further his own self interest are not compensable
   notwithstanding incidental benefit to the estate) *with In re Celotex Corp.,* 227 F.3d 1336, 1338, 44

27  C.B.C.2d 1406 (11th Cir. 2000) ("Examining a creditor's intent unnecessarily complicates the analysis of
   whether a contribution of considerable value or worth has been made."); *In re DP Partners, Ltd.,* 106 F.3d

28  667, 673, 37 C.B.C.2d 809 (5th Cir. 1997) (section 503(b)(3)(D) does not require a "self-deprecating,
   altruistic intent" as a prerequisite to recovery).  The Ninth Circuit has not decided the issue.  *In re Cellular
   101, Inc.,* 377 F.3d at 1097. The court determines that it is not necessary to decide this issue in this case.

1    substantial contribution.

2        The court must determine whether Data Leverage's claim meets the standard for

3    substantial contribution under 11 U.S.C. § 503(b)(3)(D), but as *Collier on Bankruptcy*

4    observes: "The [Bankruptcy] Code does not 'define' substantial contribution' or set forth

5    criteria to be used in determining whether a substantial contribution has been made in a

6    case."  4 Levin and Sommer, *Collier on Bankruptcy,* ¶ 503.10[5][a].  As *Collier* further

7    comments, "[w]hether a particular entity has made a substantial contribution is a

8    question of fact, and the movant bears the burden by a preponderance of the evidence."

9    *Id., citing inter alia, Pierson & Gaylen v. Creel & Atwood,* 785 F.2d 1249 (5th Cir. 1986)

10    and *In re Bayou Group, LLC,* 431 B.R. 1092, 1096 (Bankr. S.D.N.Y. 2010).  As the

11    Ninth Circuit stated in *In re Cellular 101, Inc.,* "the principal test of substantial

12    contribution is 'the extent of benefit to the estate.'"  *In re Cellular 101, Inc.,* 377 F.3d at

13    1096 (citation omitted), *cited in,* 4 Levin and Sommer, *Collier on Bankruptcy,*

14    ¶ 503.10[5][a].  As *Collier* further observes, "[n]early all cases have held that the

15    contribution must provide tangible, clearly demonstrable benefits to the estate."  4 Levin

16    and Sommer, *Collier on Bankruptcy,* ¶ 503.10[5][a], *citing and quoting, In re Best*

17    *Products Co., Inc.,* 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994) ("The integrity of section

18    503(b) can only be maintained by strictly limiting compensation to extraordinary creditor

19    actions which lead directly to tangible benefits to the creditors, debtor or estate.").

20    Moreover, as *Collier* further observes: "Courts have construed the substantial

21    contribution provisions of section 503(b)(3)(D) narrowly."  *Id., citing, In re Dana Corp.,*

22    390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008) and *In re Granite Partners, L.P.*, 213 B.R.

23    440, 445 (Bankr. S.D.N.Y. 1997).

24        In its post-trial brief, Data Leverage argues that the three expenditures that it

25    made and now claims as a substantial contribution benefitted the estate.  First, as to the

26    payment of $122,572.68 to Selene Finance, Data Leverage asserts that "[b]y paying this

27    sum, Data stopped the foreclosure and the estate, when later reopened, sold the unit

28    with a considerable profit.  Had Data not put up the monies to stop the foreclosure, unit

1   1802 would have been lost to foreclosure."  Data Leverage's Post-Trial Brief, Docket

2   No. 185, filed on June 23, 2021, at 4.  Second, as to the payment of $17,255.50 in

3   mortgage payments to Selene Finance, Data Leverage asserts: "That benefitted the

4   estate by a reduction of indebtedness of $17,255.50 and it prevented Selene from

5   starting a new foreclosure."  *Id.*  Third, as to the payment of defaulted property taxes of

6   $20,774.19 on Unit 1803, Data Leverage asserts

7   . . . the taxes had to be paid within a couple of days, by or about June 27, 2019
8   or else the unit would be set for sale.  While the sale date would be some date in
    the future, by setting the unit for sale, the only way to cure the default was to pay
9   in full.  By paying the $20,774.19, Data could delay the setting of the tax sale
    date and Data could make arrangements to pay the remaining unpaid taxes over
10  time.

11  *Id.* at 4-5.  In sum, Data Leverage argues: "The dollar value of Data's contribution far

12  exceeds the figures above because but for Data's contributions, the two units and their

13  equity would have been lost and the estate would not today be in the position it finds

14  itself."  *Id.* at 5.

15      Data Leverage's last assertion that but for its expenditures, "the estate would not

16  today be in the position it finds itself" is perhaps ironic because the position of the estate

17  is not so good as it appears that it is administratively insolvent if Data Leverage's

18  substantial contribution claim were allowed.  The only asset of the estate was the real

19  property, the two condominium units, Units 1802 and 1803, which were sold to Binafard

20  for $880,000.00 through this reopened bankruptcy case, resulting in net proceeds of

21  $133,879.92.  Chapter 7 Trustee's Report regarding Sale of Real Property, Docket No.

22  174, filed on February 2, 2021. [16]  If Data Leverage's claim of $160,602.57 were allowed

23  in full as a substantial contribution claim under 11 U.S.C. § 503(b)(3)(D), it would

24

25  _____

26  [16]  The court takes judicial notice of the trustee's sale report filed in this case, reporting the results of the
    sale of the property pursuant to Federal Rule of Evidence 201.  The facts of the results of the sale are not
    disputed.  Data Leverage in its post-trial brief refers to comments made by counsel for the trustee during
27  the evidentiary hearing that the estate still needed to pay Binafard $30,000 from the net sales proceeds.
    Data Leverage's Post-Trial Brief, Docket No. 185 at 2 n. 1.  The court disregards the alleged $30,000
28  obligation as the evidence of such obligation is not reflected in the trustee's sale report and is not
    otherwise reflected in the record as Data Leverage points out.

swamp the available funds in the estate of $133,879.92, causing the other

administrative expense claimants, namely, the trustee and his professionals, to share

the available funds on a pro rata basis under 11 U.S.C.  §§ 507(a)(2) and 726(a) and

(b), with no funds available for distributions to creditors holding general unsecured

claims.  This indicates that the estate would have been better off if the property went

into foreclosure and there would not have been administration of an insolvent estate in

which the trustee and estate professionals would be only partially paid and have to

render some services without full compensation.

It is true that the secured creditors benefitted from the sale of the property in the

bankruptcy case as their claims were paid through the administration of the bankruptcy

estate in this case through the escrow for the sale of the property, that is, the senior lien

that was held by Selene Finance was paid off in the amount of $367,617.63, the liens of

the homeowners' association were paid off in the amounts of $121,403.86,

$150,883.45, $57.87 and $80.84, the property tax liens of the Los Angeles County Tax

Collector were paid off in the amounts of $1,565.86 and $3,767.23 and the secured

claim of the Kleemoff bankruptcy estate was paid off in the amount of $20,000.00.

Chapter 7 Trustee's Report regarding Sale of Real Property, Docket No. 174, filed on

February 2, 2021.  However, generally speaking, these creditors did not need the

administration of the bankruptcy estate in this case in order for them to collect on their

claims as they had remedies outside of bankruptcy to enforce their liens through

foreclosure or tax sales. [17]  *See, In re KVN Corp.,* 514 B.R. 1, 5-6 (9th Cir. BAP 2014)

(stating the general legal principle for the prohibition against the sale of fully

encumbered property in Chapter 7 bankruptcy cases, citing and quoting the official

Handbook for Chapter 7 Trustees: "Generally, a trustee should not sell property subject

to a security interest unless the sale generates funds for the benefit of unsecured

---

[17]  The Kleemoff bankruptcy estate is somewhat an anomaly as its secured claim was the result of
settlement negotiations with the estate resolved through the compromise with the estate based on its
claim of ownership of the property as it otherwise would have had only an ownership interest or no
interest if the dispute were litigated.

creditors.  A secured creditor can protect its own interests in the collateral subject to the

security interest.  U.S. DOJ Exec. Office for U.S. Trs., Handbook for Chapter 7 Trustees

at 4–16 (2012)").  Accordingly, these creditors did not really benefit from the bankruptcy

case.

As previously discussed, if allowed, Data Leverage's substantial contribution

Based on the court's analysis of the financial position of the estate, there was no

actual, tangible benefit to the estate from the expenditures by Data Leverage.  The

estate would be administratively insolvent if the court allows Data Leverage's

substantial contribution claim, and the other administrative expense creditors would not

be fully paid as they would have to share pro rata any available funds in the estate with

Data Leverage, and the other creditors, namely, the general unsecured creditors would

receive nothing.

As previously discussed, if allowed, Data Leverage's substantial contribution

claim of $160,602.57 would swamp the assets of the estate consisting of the property

sales proceeds of $133,879.92.  The trustee's statutory compensation and expenses

and the fees and expenses of his professionals are administrative expense claims that

must come out of the available estate funds.  It is unknown what are the administrative

expense claims of the trustee and his professionals, but the professional fees are likely

to be large in light of the intensive litigation of contested matters in this case.  Based on

distributions to secured creditors from the escrow for the sale of the property totaling

$665,396.78, the statutory fees under 11 U.S.C. § 326 would be $36,519.89 (based on

the statutory formula, 25 percent on the first $5,000, or $1,250, 10 percent on the next

$45,000, or $4,500, and 5 percent on the next $615,396.78, or $30,769.84).  The net

sales (proceeds of $133,879.92) remain to be distributed, and the trustee's statutory fee

under 11 U.S.C. § 326 would be 5 percent of any remaining distributions.  Assuming

hypothetically that the fees and expenses of the trustee's counsel under 11 U.S.C. §

330 are approximately $60,000, estimated Chapter 7 administrative expenses would be

about $100,000, including estimate trustee's statutory fees, and add Data Leverage's

substantial contribution claim of approximately $160,000, total administrative expense

1    claims would be estimated at $260,000, of which about $130,000 in assets remain for

2    distribution, or roughly 50% dividend on administrative expense claims.

3            As to general unsecured claims, the claims reflected on the filed proofs of claim

4    have been all resolved.  Data Leverage's filed proof of claim was disallowed because it

5    is not a prepetition claim.  The filed proofs of claim of the homeowners' association and

6    the Los Angeles County Tax Collector have been paid in full through the sale of the real

7    property.  There are no other filed proofs of claim.  The only outstanding general

8    unsecured claim is the unfiled claim of the Kleemoff bankruptcy estate in the amount of

9    $66,000.00 which is deemed allowed pursuant to the compromise with the estate.

10   However, conceivably, other creditors could file late claims for distributions after the

11   extended bar date of November 4, 2019 pursuant to 11 U.S.C. § 726(a)(2) and (3) as

12   the debtor listed 30 creditors holding general unsecured claims on his bankruptcy

13   schedules totaling $78,597.07.  Petition, Docket No. 1; Notice of Possible Dividend and

14   Order Fixing Time to File Claims, Docket No. 21, filed and entered on August 1, 2019.

15   No distribution would be made on general unsecured claims as the estate would be

16   administratively insolvent if Data Leverage's substantial contribution claim is allowed.  It

17   thus appears on this record, there was no substantial contribution here because the

18   estate is left administratively insolvent with only the secured creditors getting paid, the

19   trustee and estate professionals having to take an involuntary discount on their fees and

20   no distribution to general unsecured creditors. *See In re KVN Corp.,* 514 B.R. at 6

21   (stating that a Chapter 7 trustee must consider whether there would be a meaningful

22   distribution to unsecured creditors before administering an asset case, citing and

23   quoting the Handbook for Chapter 7 Trustees at 4-1: "A chapter 7 case must be

24   administered to maximize and expedite dividends to creditors. A trustee shall not

25   administer an estate or an asset in an estate where the proceeds of liquidation will

26   primarily benefit the trustee or the professionals, or unduly delay the resolution of the

27   case. The trustee must be guided by this fundamental principle when acting as trustee.

28   Accordingly, the trustee must consider whether sufficient funds will be generated to

1  make a meaningful distribution to unsecured creditors, including unsecured priority

2  creditors, before administering a case as an asset case. 28 U.S.C. § 586.").

3       Allowance of a substantial contribution claim which renders the estate

4  administratively insolvent as would be the case here is contrary to the efficient and

5  orderly administration of the bankruptcy estate under Chapter 7 of the Bankruptcy Code

6  as the expenses incurred here were not made under the supervision of the trustee who

7  is charged with the efficient administration of the estate under 11 U.S.C. §§ 541 and

8  704 and the trustee and his professionals would be compelled to receive less

9  compensation that they are entitled to under the Code pursuant to 11 U.S.C. §§ 326

10  and 330.  Foreclosure or abandonment of the property under these circumstances

11  would have been a better result for the estate and the unsecured creditors.  Based on

12  this record, Data Leverage has not shown that its expenditures made a substantial

13  contribution to the estate and in this case.[18]

14       As discussed herein, Data Leverage has not met its burden of proving that its

15  expenditures made a substantial contribution resulting in a benefit to creditors, and

16  therefore, its substantial contribution claim should be denied.  This finding is an

17  alternative basis for denial of the substantial contribution claim.

18       ///

19       ///

20

21  _____

[18] The question posed in this contested matter is whether Data Leverage is entitled to payment of an
22  administrative expense claim under 11 U.S.C. § 503(b)(1)(A) and (b)(3)(D) for expenditures that it made
relating to the debtor's real property, an asset of the estate.  If such claim is disallowed, based on the
23  court's estimations above of the trustee's statutory fee of $36,519.89 based on distributions on secured
claims so far, and estimated professional fees and expenses of trustee's counsel of $60,000, there would
24  be roughly $37,000 available after the payment of the trustee's statutory fee and professional fees and
expenses of trustee's counsel as administrative expense claims for distribution on general unsecured
25  claims, or roughly a dividend of about 50 percent on the remaining general unsecured claims.  The
precise question before the court is whether Data Leverage's expenditures made a substantial or other
26  contribution in the case under 11 U.S.C. § 503(b)(1)(A) and (b)(3)(D).  Based on the court's analysis, the
answer is no.  However, a different question might be whether Data Leverage's information about the
27  debtor's undisclosed assets has benefitted the estate, and the answer would be yes since such
information was the basis for reopening the case and allowing estate administration, which will result in
28  payment of expenses of administration and a 50 percent dividend on allowed general unsecured claims
based on the court's projections.  But unfortunately for Data Leverage, there does not seem to be any
remedy for it to recover from the estate on its expenditures made here relating to estate property.

1

### CONCLUSION

2        For the foregoing reasons, the court will deny the Motion.  A separate final order

3  will be filed and entered concurrently herewith.

4        IT IS SO ORDERED.

5                                    ###

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Date: August 23, 2021        _____

26                                Robert Kwan
                                United States Bankruptcy Judge

27

28